1      IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO
2

3   Criminal Action No. 21-cr-192-RM

    UNITED STATES OF AMERICA,
4

5        Plaintiff,

6   vs.

7   1. ROBERT REGER and
    2. DAVID LYTLE,
8

9        Defendants.
    _____

10

11                    **REPORTER'S TRANSCRIPT**
                            Hearing

12  _____

13          Proceedings before the HONORABLE RAYMOND MOORE, Judge,
    United States District Court for the District of Colorado,
14  commencing at 11 a.m., on the 5th day of August, 2022, in
    Courtroom A601, United States Courthouse, Denver, Colorado.
15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **APPEARANCES** |
| 2 | Patrick Thomas Campbell, Baker & Hostetler LLP, 45 Rockefeller |
| | Plaza,New York, NY 1011 and Christopher Shawn Cleveland, Baker |
| 3 | & Hostetler LLP-Dallas, 2850 North Harwood Street, Suite 1100, |
| | Dallas, TX 75201, appearing for Epsilon, Interested Party. |
| 4 | |
| 5 | Rachael L. Doud, and Alistair Francis, U.S. Department of |
| | Justice, Civil Division, Consumer Protection Branch, 450 5th |
| 6 | Street NW, Suite 6400, Washington, DC 20530, appearing via VTC, |
| | for the Government. |
| 7 | |
| 8 | Ehren P. Reynolds, U.S. Department of Justice, Antitrust |
| | Division, Washington Criminal II Section, 450 5th Street N.W., |
| 9 | Washington, DC 20530, appearing for the Government. |
| 10 | |
| 11 | Brian Rowland Leedy, Ridley McGreevy & Winocur PC-Denver, 303 |
| | 16th Street, Suite 200, Denver, CO 80202, appearing for the |
| 12 | Defendant, Mr. Reger. |
| 13 | |
| 14 | Melanie Susan Morgan, Morgan Pilate LLC, 926 Cherry Street, |
| | Kansas City, MO 64106, appearing for the Defendant, Mr. Lytle. |
| 15 | |
| 16 | TAMMY HOFFSCHILDT, Official Reporter |
| | 901 19th Street, Room A251 |
| 17 | Denver, Colorado, 80294 |
| | (303) 292-1088 |
| 18 | Proceedings Reported by Mechanical Stenography |
| | Transcription Produced via Computer |
| 19 | (In open court at 11:04 a.m.) |
| 20 | THE COURT:  Please be seated. |
| 21 | THE COURT:  All right.  That did not go well. |
| 22 | 21-cr-192 United States versus Robert Reger and David, I always |
| 23 | get confused, David Lytle? |
| 24 | THE DEFENDANT:  Yes. |
| 25 | THE COURT:  All right.  We're having a hearing that |

1    really pertains to two motions.  Motion to quash the subpoena

2    and a Motion to clawback certain an inadvertently produced

3    document.  The Motion To Clawback, which is **Number 111**, I doubt

4    we will get to.  We will see what we do, in terms of -- we will

5    see what we do in terms of the Motion To Quash.

6           You have my apologies, in some respects.  I don't

7    think I properly anticipated the number of bodies and the

8    degree of dispute.  I have a 1 o'clock.  We can go a little

9    today.  We will see where we get to.  I will tell you all that

10   I will give you as much of Tuesday, Wednesday, or Thursday, of

11   next week, as you want, if we don't finish, because I have

12   those days open.  The trial that was next week has gone away.

13   Perhaps, in retrospect, I should have just moved this to then,

14   and had you all here, but to some extent, I just as soon get

15   started and see where we are.

16          So, we will see where we end up.  Let me see if I have

17   got this right.  Let me take patterns, from the party Epsilon,

18   please.

19          *MR. CLEVELAND:*  My name is Shawn Cleveland along with

20   Patrick Campbell and Kristi Jackson.  We represent non-party

21   Epsilon Data Management.  We are with Baker Hostetler.

22          *THE COURT:*  Good morning to all of you.  The

23   government is here, although it's not clear to me, perhaps even

24   to them, the extent to which they have a dog in the hunt, but

25   nonetheless, let me take appearances from the government, who

1    did not issue this subpoena.

2        MR. REYNOLDS:  Good morning, Your Honor.  Ehren

3    Reynolds, from the United States Protection Branch, and I'm

4    joined by video teleconference by my colleagues, Rachel Doud

5    and Alistar Reader.

6        THE COURT:  All right.  Good morning to you, who is

7    here, and good morning to Ms. Doud and Mr. Reader, who are

8    appearing from, I assume, the mother ship or near the mother

9    ship in DC.

10        And then, on the defendant's side, who jointly issued

11   the subpoena that is in question.

12        MR. LEEDY:  Good morning, Your Honor.  Brian Leedy on

13   behalf of Mr. Reger.  He is here to my right.

14        MS. MOGAN:  Good morning, Judge.  Melanie Morgan on

15   behalf of Mr. Lytle, who is to my left.

16        THE COURT:  Good morning to all of you, counsel and

17   the parties.  There somebody sitting back there, I don't know

18   who she is, but I'm assuming she is IT for somebody.  IT for

19   somebody, we will just call her IT and move on.

20        All right.  Let me hear from you.

21        MR. CLEVELAND:  Yes, Your Honor.  Thank you.  For

22   Epsilon on our Motion to Quash, would you like me to argue from

23   the podium or from the seat?

24        THE COURT:  I guess I prefer the podium, but if you

25   have got so much stuff that you can't handle it, I don't mind

1    you making some accommodations for you.

2              MR. CLEVELAND:  Not at all, Your Honor, this is great.

3    Is that too loud?  Can you hear me all right?

4              So, I would like to ask the Court to allow me to

5    briefly summarize, in the interest of time, our key arguments.

6              THE COURT:  Okay.

7              MR. CLEVELAND:  Then provide you a short amount of

8    relevant background, and walk you through, just two documents,

9    that will really illuminate a lot of what is going on here, I

10   think.  I can do all of that in five to ten minutes.

11             THE COURT:  What is this, Name That Tune?

12             MR. CLEVELAND:  We, will see.  Of course, I'm prepared

13   to go into detail and brief on the authorities and so forth.

14             THE COURT:  So, go ahead, and I guess all that I want

15   to say is, don't feel rushed.  I fully accept the blame at

16   the -- if the hourglass empties before this is resolved, but

17   you shouldn't feel rushed because of that.

18             MR. CLEVELAND:  Thank you, Your Honor.  I appreciate

19   that.

20             So, Epsilon respectfully asks the Court to quash the

21   defendant's subpoena seeking over 10,000 privileged documents.

22   All of the documents, on Epsilon's privilege logs, produced to

23   the Department of Justice, in their investigation, under grand

24   jury subpoena.

25             We ask the Court to quash the subpoena for two very

straightforward and independently adequate reasons, either of

which justifies quashing the subpoena in its entirety.

First, Rule 17(c) subpoenas, as the Court well knows,

are not discovery devices.  The defendant's subpoena, seeking

more than 10,000 privileged documents, should be quashed,

because it fails to meet Rule 17(c)'s strict requirements for

specificity, relevancy and admissibility.

This is laid out in our brief in detail, but I will

summarize it here.  The defendants have not met and cannot meet

their burden to specifically identify documents, specifically

identify the documents that that support their claimed

advice-of-counsel or good-faith defense to the indicted

conduct.  That is the standard, a very specific, exacting

standard and it's a fair standard, because if they had actually

disclosed to company counsel what they were doing, disclosed it

fully and received legal advice that what they were doing was

approved, they could point you to the documents showing that.

Now, we are not saying that they should be able to

pinpoint a document on a privilege log, but it's fair, if you

claim that you relied on these statements, for you to say, I

remember, I emailed a specific lawyer at the company, around

September or October of a certain year; I told him X, Y and Z

about these clients; and he gave me legal advice, approving

what I was doing.  You can do that, and that's what the rule

requires, and they have not done, in any form or fashion,

1    despite being alerted to their obligation, their burden, to do

2    that in our Motion to Quash.

3           Your Honor, they can't identify documents like that,

4    because those documents don't exist.  It didn't happen.  And

5    that's why they want to subpoena over 10,000 documents on these

6    privilege logs, or as they have suggested, have you review over

7    10,000 documents on these privilege logs in-camera, hoping --

8           THE COURT:  Anybody who thinks I'm really interested

9    in reviewing 10,000 documents one by one, please raise your

10   hand?

11          It's correct a vote; I'm not.  But we will get to that

12   in more detail.  Go ahead.

13          MR. CLEVELAND:  Thank you, Your Honor.  So, they want

14   to see and perhaps have you review these documents, all 10,000

15   of them, in the hope they can find some communication with the

16   legal department, with someone at Epsilon, that they can now

17   claim to have relied upon, after the fact.  If that wasn't what

18   they were doing, they could identify the documents precisely.

19          It's a classic fishing expedition.  It's prohibited

20   under Rule 17, and it's particularly egregious, in the context

21   of seeking to pierce something as fundamental and important as

22   the attorney-client privilege.

23          To give the Court just a sense of the kinds of

24   documents contained in these logs, the vast majority of them

25   are communications about things like terms and in contracts

1    that have nothing to do with the issues in this case, and the

2    reason all of those documents were produced, that don't relate

3    to issues in the Indictment, is because; number one, the

4    investigation was a lot broader than the Indictment; number

5    two, the subpoenas are very broad.  They use terms like *related*

6    *to*.  So you get a lot of documents produced that won't have

7    anything to do with what's going on in this case.

8          Additionally, those productions are negotiated.  So,

9    the subpoenas can cover the world, but the subpoenas are

10   negotiated to sometimes include things that are very broadly

11   related, and the reason I point that out is because defendants

12   have made a point to say, if it was subpoenaed in the DOJ grand

13   jury subpoenas, it's obviously relevant to an Indictment;

14   that's just simply not the case.

15         Now, of the privilege -- I will show you a couple of

16   documents today, one that is not privileged, that will give you

17   a lot of context about what's going on here, and one that is

18   privileged; █████████████████████████████████████████████████

19   █████████████████████████████████████████████████████████████

20   █████████████████████████████████████████████████████████████

21   █████████████████████████████████    █████████████████████████

22   █████████████████████████████████████████████████████████████

23   █████████████████████████████████████████████████████████████

24   █████████████████████████████████████████████████████████████

25   ██████████████████████████████████

1          So, the second independent reason that this subpoena

2    should be quashed is that even if the failure to satisfy Rule

3    17 were not dispositive, which it is, and even if the Court

4    needed to reach the ultimate privilege issue, as to whether

5    these -- these defendants can pierce the privilege, the

6    subpoena should be quashed for the independent reason that it

7    seeks, clearly, attorney-client privileged materials, that are

8    protected from disclosure under clear Tenth Circuit precedent.

9    That precedent says the Sixth Amendment -- the Sixth Amendment

10   right to present a defense, does not displace traditional

11   testimonial privileges, including the attorney-client

12   privilege.  It's very clear.

13          *THE COURT:*  Let me just talk about that for a little

14   bit with you, because, frankly, I think both sides are a little

15   bit at extreme positions.  I characterize -- you don't know me.

16   I try to be transparent.  I characterize your position as, if

17   not absolute, near absolute, privilege, that's it.  We own the

18   privilege.  We don't waive the privilege.  You can't require

19   privileged information to be provided or used in the trial.

20   And of course, the interesting scenario, that if you take it --

21   and I understand that I'm exaggerating your position, but I

22   don't think by a whole lot -- the interesting scenario is this,

23   if I'm a defendant and I am -- I go to my own lawyer, the one

24   that I hire, the legality of a particular thing, and that

25   lawyer tells me X, Y and Z and I rely on that and then I get

1    indicted, of course, because I control the privilege, I waive

2    it, and the lawyer testifies in court and the jury buys it or

3    doesn't, whatever happens, happens.

4        In a corporate scenario, I work for a company, I go to

5    the company's lawyer to say, *This may or may not be legal.  I'm*

6    *not sure.  I want to check it.  I don't want to get in trouble.*

7    Corporate counsel looks, advises, says, *Everything is fine.*

8    Turns out it's not, defendant says, *Reliance on advice of*

9    *counsel, that's my defense*, and you say, *Well, that's your*

10   *defense, but too bad, so sad, you do not get to present the*

11   *evidence that would prove that this is, in fact, correct,*

12   *because the employee doesn't control the privilege, the company*

13   *doesn't have to waive it, and even though it is clearly,*

14   *absolutely the case, that the information is beyond relevant,*

15   *it is that which establishes the defense, the proof of the*

16   *defense,* according to you, you don't get it; that seems a

17   little extreme.

18       Now, don't get me wrong, I think -- I characterize the

19   defendants in this case, the people who issued the subpoena, as

20   saying, *Well, we ought to be able to overcome the subpoena*

21   *whenever something maybe, could, might, possibly be relevant to*

22   *a defense*, and I think that's extreme in the other direction.

23   Where, exactly, I come out, we will see, but, you know, calling

24   that privilege, as absolute as you seem to call it, I mean I

25   don't think the Circuit is saying that, you know, privilege as

1   applies, means it applies without exception or it can't be

2   overcome or anything like that.  I mean, again, there's a lot

3   of different cases.  There are a few cases cited, and they are

4   off, in terms of the facts of this case by just a little bit.

5   Some are analogous, some are subject to argument about whether

6   the analogy is good enough, but are you really planting your

7   flag on *absolute* hill?

8           MR. CLEVELAND:  So, Your Honor, I think the case law

9   is strong on that, but really appreciate your perspective that

10  you are sharing, and I would say that if there are situations

11  where a defendant should be able to pierce the privilege, this

12  is clearly nowhere close to one of them.  I do understand that

13  there are cases and other Circuits that apply a balancing

14  test --

15          THE COURT:  Yeah.  I don't want to say it's such a --

16  that the scenario is such that I'm leaning towards *Grace* or

17  whenever there's a privilege issue, I get to, you know, take

18  them all into chambers and do with that Judge apparently was

19  talking about doing, which is, I don't know, having a filing

20  cabinet behind him, and on the spot going this one is in, that

21  one is out.  I'm no more interested in micromanaging a defense

22  than I am micromanaging a prosecution, but the concept of some,

23  circumstance where the Court can permit the -- require that

24  either the document or the information be produced, I'm not

25  saying this is -- this is that situation, but I'm more inclined

1    to see that there may be scenarios that fit that, than you are.

2            *MR. CLEVELAND:* Understood, Your Honor. And I think

3    those are very extreme cases. I will say the reason that I

4    think that the law is so extreme, in this regard, and if there

5    are exceptions where the privilege could be pierced by a former

6    employee, they would be very rare, is because of the paramount

7    importance of the privilege to companies, and to their

8    employees to allow full and frank discussion. You know the

9    privilege, as was recognized --

10           *THE COURT:* But the policy as it pertains to the

11   employee getting trashed if, in fact, the employee can't rely

12   on the company to affirm what it told him. Again, I'm not

13   saying that's this case, but ... let me be quiet. I have a

14   tendency to play Zorro with lawyers perhaps more than I should.

15           *MR. CLEVELAND:* I appreciate the discussion,

16   Your Honor. But to your point, if there are rare exceptions or

17   if a Court might provide a balancing test, where they would

18   say, for example, there is a clear reliance on counsel, they

19   fully disclosed, they got the advice, I think that the Sixth

20   Amendment should dictate that they should be able to offer

21   that. You will see, and you can see it from the documents that

22   are not privileged, that is not this case, and you will see

23   that, if the Court were to look at this, and, you know, apply

24   some sort of analysis, whether it's balancing in other Circuit

25   or something else, that on the defendant's side of the scale,

1   it's important to note that they have not identified a single

2   document that is relevant or supportive of a defense or how it

3   could be, and that includes the inadvertently produced

4   document, which I will walk through with you, in a little bit,

5   with another document to provide some context as to why that's

6   so.

7          Furthermore, as the Court can see from the other

8   documents filed in the record, the documents in this case are

9   of the type, if they had documents, like the one that they have

10  offered, that they should know what they relied on, and it's

11  fair to have them point that out, and they just can't.  They

12  just haven't.

13         I would say, just on the point of the case law, and

14  the importance of the privilege, you know, there are a couple

15  of aspects of this that make the privilege particularly

16  important.  We all want to see defendants have a fair trial,

17  but only a fair trial to the extent that they are entitled to

18  actually adduce fair evidence and evidence that supports their

19  position.

20         On the other side of the scale here, there are some

21  serious harms.  If these privileged documents were to be

22  produced, the effect is not just limited to this case.  It

23  would open the floodgates for former employees, and basically,

24  kill the attorney-client privilege and practice for

25  corporations and their employees communicating.  It would be

1    extremely chilling.

2         And in this particular case, production of these

3    privileged documents would open those documents to being

4    introduced in a public trial, in this case, or used in other

5    civil proceedings, that could occur, destroying that protection

6    and creating significant harm.

7         As the Supreme Court said in *Upjohn*, I just want -- I

8    know the the Court is probably familiar with this, but I want

9    to point this out for the record, I don't think this is

10   necessarily key in our briefing, but the *Upjohn* Court pointed

11   out that on uncertain privilege, or one which purports to be

12   certain, but results in widely varying application by Courts is

13   little better than no privilege at all.  So there are really

14   important issues here, really important issues on the other

15   side too, but the scales are firmly in favor of privilege in

16   this context.

17        I would like to give you just a very little bit of the

18   factual and procedural background that's relevant to this, and

19   then I would like to talk about those two documents I have been

20   mentioning.

21        As you know, Your Honor, January 2021, Epsilon and the

22   Department of Justice entered into a Deferred Prosecution

23   Agreement before this Court.  The Deferred Prosecution

24   Agreement includes a one-count charge of Conspiracy to Commit

25   Mail and Wire Fraud, which relates to certain former employees'

15

1    misconduct, as identified in the Statement of Facts.

2         Specifically, the conduct at issue is outlined in that

3    Statement of Facts, involved certain employees causing Epsilon

4    to sell consumer data, lists of consumer names and addresses to

5    third-party mailer clients of Epsilon; that these employees

6    knew were engaged in mailing fraudulent and deceptive

7    solicitations to consumers; that's the gist of the DPA, and the

8    defendants were indicted for allegedly engaging in that

9    misconduct as those employees who were acting on behalf of the

10   company.

11        So, I would like to turn, now, to the two documents,

12   that will put a lot of this in context and demonstrate what is

13   really going on here in a very concrete way, and it's important

14   for the Court to understand, because of the company's vital

15   interest in maintaining the privilege, and because of the

16   complex nature of the record, and all of the factual, both

17   vague and numerous factual assertions in the briefing, I think

18   these documents will help to clear that up.

19        So, I would like to first show you, if I may approach?

20        THE COURT:  Please, go ahead.  Look, one of the things

21   that I don't do is consider myself some degree of royalty that

22   can't be disrespected.  So, what I mean by that is, Mr. Leedy

23   or Ms. Morgan, if you want to move up here, either with your

24   chairs, rolling them over, or without them, I'm fine with that.

25   I'm sorry, I forgot the government.  You get to come up, as

1    well.

2            MR. CLEVELAND:  Your Honor, is it all right if I stand

3    with the demonstrative.

4            THE COURT:  Yeah, that's fine.

5            MR. CLEVELAND: ████████████████████████████████

6    ██████████████████████████████████████████████████

7    ████████████████████████████████████████████████████

8    ████████████████████████

9            THE COURT:  I understand.  I know what it says.  It is

10   not public, in the record, as it now exists, so go ahead.

11           MR. CLEVELAND:  Understood, Your Honor.  I'm going to

12   be careful to point you to things in that document not to

13   reveal the communications in the document.

14           ███████████████████████████████████████████████

15   ████████████████████████████████████████████████████

16   █████████████████████This is a document that was filed by the

17   government, as **Document 109-9**, attached to a *James* hearing

18   filing, that they made, and I just want to orient you to the

19   document.

20           They have redacted the name of the unindicted

21   co-conspirator, as I understand, though I don't have an

22   un-redacted copy of this document.  I got it from the filings;

23   that's how I received this document.  You can get it on Pacer.

24           What you see here is that, non-indicted co---

25           THE COURT:  Let me just pause.  Is it KS?  Or is it

1  SK, I should say?

2          *MR. REYNOLDS:*  No, sir, let me doublecheck that.

3          *THE COURT:*  You are not sure right now.  All right.

4  Go ahead.

5          *MR. CLEVELAND:*  So, you will see on Friday, September

6  23rd of 2016, this unindicted company conspiracy email to

7  David Lytle, email titled, Justice Department Link, in the

8  subject line.  It says Micromark, PackNet, MDI, others listed

9  in this action, and it includes a link to a Department of

10 Justice Press Release, detailing numerous enforcement actions

11 against entities engaged in elder fraud.  It includes this --

12 if you were to click on this link, you could see, and it may or

13 may not be in the record, but this link is in the record, you

14 would see that one, and only one of the enforcement actions

15 detailed in this press release is the TRO against the Epsilon

16 clients that the defendants make so much of in their filings

17 and that they have attached to one of their filings.

18         There are numerous other enforcement actions against

19 ████████████████████████████████████████████████████

20 ██████████████████████████████████████████████████████

21 ███████████████████████████████████████████████████

22 ███████████████████████████████████████████████████████

23 ███████████████████████████████████████████████████████

24 █████████████████████████████████████████████████████

25 ██████████████████████████████████████████

1　████████████████████

2　　　　　So this is being sent around to various people,

3　including to Robert Reger, the other defendant in this case,

4　with a copy to David Lytle.  It says, in this section of the

5　email, 10:06 a.m., You all have to read this.  Not sure what we

6　do with BDK, but legally might make sense for us to distance

7　ourselves from this.  Read article in link below.  Thank Kyle

8　for sending.  Also cracking down on opportunistic space, et

9　cetera.

10　　　　　BDK is another entity which Epsilon did business along

11　with Micromark and others in that press release.

12　　　　　Now, here in the next part of the -- and you will

13　notice they refer to opportunistic space, cracking down on it,

14　generally.  If you were to see the other records in the report,

15　the defendants put in the record, certainly received in

16　production from the government, you will see a whole series of

17　emails around this, different threads spouting off of this,

18　where people talk about their various clients who may be next

19　to be shutdown.  Talking about the opportunistic space means

20　these kinds of clients.  You see a lot of that.

21　　　　　Here you see them referring to two of the entities, in

22　the top portion of the email, that say Horizon and Quantum,

23　those are the entities in the one TRO that legal counsel

24　received from a third party.  He says, *Okay, forwarding to the*

25　*whole team, because I think we all need to be in the know ... I*

1    *am not sending to legal or anyone higher up than Rob.  I will*

2    *leave that to you guys,* an unindicted -- perhaps a pleaded

3    co-conspirator, and Rob is who he is referring to here in the

4    parenthetical.  He says, *I will leave that to you guys, blank*

5    *and Rob* to *decide what you want to do about any of this ...*

6            Then there's another note, under *Iowa Attorney General*

7    *Actions against list broker and direct mailers action, notes a*

8    *client marketing something similar to World Marketing Group,*

9    *lot to book, no mention of WMG, but food for thought.*  Again,

10   these are other Epsilon clients engaged in this space.

11           As I said, you will see numerous email threads

12   containing the same discussion and different subjects and

13   different discussions about different clients, where the

14   defendants and the other employees, in this small group, within

15   Epsilon, are forwarding this link around, discussing these

16   actions and discussing the fact that they have many other

17   clients in the same type of business defrauding consumers.

18   They are worried those clients will get shutdown too.  You

19   would see all of that, but you won't see any version of this

20   document or those documents on Epsilon's privilege logs.  If

21   you were to review all of the documents, underlying those

22   10,000 entries, you won't see any documents where anyone

23   forwards this DOJ Press Release to legal counsel or forwards

24   all of the extensive discussions they are having about all of

25   these other clients, that's -- you won't see a single one.

1    They don't exist, and that is not an accident when you have

2    that many documents; that's concealment.  It's the opposite of

3    the full disclosure that's required for an attorney-client --

4    for advice-of-counsel defense or a good-faith defense, and that

5    dooms any such defense, and it makes this whole line of

6    ████████████████████████████████████████████████████████

7    ██████████████████████████████████████████████████████████

8    ██████████████████████████████

9        So I will go back to the podium, if that's okay?

10       *MR. CLEVELAND:*  Again, I will refer to the other

11   document in the bench book, and it's in the documents that

12   opposing counsel and the government has, as well.  I will point

13   you to that directly.

14       So, whatever else these defendants might try to claim

15   about process, you see a lot of that in their brief, a lot of

16   allusions to general allegations of process, many of them

17   fundamentally inaccurate and inconsistent with the record, but

18   you see that.

19            ████████████████████████████████████████████

20   ██████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████

22   ██████████████████████████████████████████████████████████

23   ██████████████████████████████████████████████████████

24   ████████████████████████████████████████████████

25   ███████████████████████████████████████████████████



1

2

3

4

5

6

7

8

9

10

11     But the broader point, before we leave the document I

12  have referenced, that is the document that states that they are

13  not sending this to legal, is that these employees knew that

14  the Horizon and Quantum TRO was only one of the enforcement

15  actions in that DOJ enforcement press release and when they

16  were confronted with the TRO as to one of them, they did not

17  say a word about all of the others and about all of the

18  discussion they had been having.

19

20

21

22

23

24

25



1  ████████████████████████████████████████████████

2  ████████████████████████████████████████████████

3  ████████████████████████████████████████████

4  ████████████████████████████████████████████████

5  ████████████████████████████████████████████████

6  ██████████████████████

7         *THE COURT:*  █████████████████████Tammy, to the

8  extent that anyone refers to **Document 99.1**, or the content of

9  **99.1**, that portion of the transcript is restricted and not

10 public.  I, at this point, have the ability to see who is in

11 the room, and I will monitor to make sure that there's not --

12 I'm not precluding someone from the public from entering the

13 room, but I would tell you that, to my knowledge, there's no

14 one who is not otherwise a part of this litigation that is not

15 in the room, although there's a woman that I do not know.  I'm

16 assuming she is known to you, by virtue of the fact that you

17 are smiling.

18         *MR. CLEVELAND:*  Yes, Your Honor.  I should have

19 mentioned, she is paralegal.

20         *THE COURT:*  That's fine.  She doesn't need to be

21 introduced.  All that I'm saying is, to the extent that any

22 point, throughout this discussion, there's reference to the

23 content of **99.1**, that portion of the record is restricted to

24 the parties and Epsilon only.

25         *MR. CLEVELAND:*  Will make it much simpler, Your Honor.



1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████

4                ████████████████████████████████████████

5 ███████████████████████████████████████████████

6 █████████████████████████████████████████████████████

7 ███████████████████████████████████████████████

8 ██████████

9          I do want to make a point about what is -- what else

10 is not in the privileged documents, because we're -- we are

11 necessarily unable to say what is in them, without endangering

12 privilege.  Epsilon is not aware of any responsive materials in

13 the privilege log that would support an advice-of-counsel or

14 good-faith defense to the allegations in the Indictment, and

15 that's what this Court has to decide, because when we look at

16 specificity and relevancy and admissibility it actually has --

17 there has to be something there that would support it in order

18 to take the drastic step of piercing the privilege.

19          So, Your Honor, I'm prepared, at this point, to go

20 through and not -- not the level detail in the briefing, but

21 more detail as to the specific authorities on specificity and

22 on privilege versus Sixth Amendment.

23          THE COURT:  I don't think I need that right now.

24          MR. CLEVELAND:  Yes, Your Honor.

25          THE COURT:  What I want to do is raise something with

1    you, that again, is in the interests of transparency.  It's

2    sort of the way it's percolating in my head.  All of this is,

3    obviously, subject to hearing from Mr. Leedy, and as well as

4    Ms. Morgan.  But, ... advice-of-counsel defense, I don't think

5    they are within shouting distance of it, because, again,

6    advice-of-counsel defense, the technical formal

7    advice-of-counsel defense, does require certain things; showing

8    that you sought legal advice; that you disclosed all

9    information with regard to the matter at issue; that you were

10    then given legal advice.

11         I will listen to them, but I don't think that there is

12    such a defense that is evident in this case, because if these

13    benchmarks that you have to hit were present, somebody would be

14    showing me or telling me or pointing to them, as to where or

15    when they sought and disclosed and all of the rest of it.

16         I think, however, the good-faith defense is a little

17    different than the way you characterize it.  And again, I don't

18    speak for them, and I don't try to necessarily put myself in

19    their shoes, but I don't believe that the good-faith defense is

20    as simple as, *We were told by legal ... and we believed them*.

21    Or at least, *Legal said stuff to us that caused us to form our

22    own belief*.  Perhaps it's that.  Perhaps there's a tinge of

23    that, but much of that is, essentially, this, *Hey, we were

24    working here, our people, the people above us, Kessler perhaps,

25    perhaps others, were advising us that they were in contact with*

1    *legal.  We assumed that if we were doing something illegal,*

2    *legal would have done something.  It's not the positive advice*

3    *that was given, it's the fact that legal never did anything to*

4    *suggest that anything that we were doing was wrong;* that is --

5    *and because of that, we, honestly, believed that what we were*

6    *doing was not fraud.*

7              Now, I don't know whether that's simply my

8    interpretation of it or not, but it is an interpretation of the

9    defense that is there.  Whether it works or not, not for me to

10   decide, not for me to rule, not for me to even order them to

11   disclose at this juncture.

12             But I think that there's a piece of it that spins

13   differently than the way that you are assuming it.  You are

14   assuming that the entirety of the defense is something along

15   the lines of, *word came down from legal, ergo defense*.  It may

16   be quite different than that.  It may be, *no word came down*

17   *from legal, no one was keeping this secret, ergo, we came to*

18   *believe what we believed.*

19             Ultimately, again, what I deeply suspect is that

20   Mr. Leedy and Ms. Morgan will tell me that they have not

21   completely formulated their defense at this stage and they

22   don't need to have formulated it entirely.

23             All I'm trying to do is say that there are variants of

24   ways of pitching this to a jury that don't necessarily require

25   the existence of a piece of paper saying -- a piece of paper

1    either going up to legal or coming down from legal, that is so

2    specific that it would otherwise trigger an advice-of-counsel

3    defense.

4         So, there... blah, blah, I rolled it at you, now you

5    swing whatever it is you swing at it; whether it be a hockey

6    stick or a baseball bat or whatever; take your piece of wood

7    and swing.

8         MR. CLEVELAND:  That's very helpful.  I think it's a

9    real useful way to have an interchange and get to the points

10   that you are most interested in.

11        So, you made several points there, and I will

12   address -- try to address all of them.  Number one, there's

13   good case law on what a good-faith defense requires, that

14   indicates that you do need to make full disclosure of the

15   things that you are doing; that you want to say, *Well, that was*

16   *in good faith*, and that didn't happen here --

17        THE COURT:  All right.  All right.  So let's change

18   the label from a good-faith defense to *We didn't have an intent*

19   *to defraud*.

20        MR. CLEVELAND:  We can change it --

21        THE COURT:  One of the things that happens in criminal

22   cases is things are fluid.  What defense counsel might say is

23   fluid, and, you know, if you don't like the way good-faith

24   defense sounds, then fine, they will cast it as, *We didn't have*

25   *the intent to defraud.  Here's why we didn't have the intent to*

1  *defraud.*  Call it good-faith defense, call it a denial of one

2  of the elements defense, call it whatever you want to, this is

3  the way we're going to roll it up there to the jury.

4       *MR. CLEVELAND:*  Yes, Your Honor, I understand, and

5  there's nothing to prevent them from saying that through other

6  witnesses.

7       *THE COURT:*  I get that.

8       *MR. CLEVELAND:*  But we are talking, specifically,

9  about them saying they must have privileged communications, in

10  order to establish that.  So I think there's a difference

11  there.  Whether you couch it as lack of intent or good faith, I

12  take your point, and they can make those arguments.  They don't

13  need -- and in fact, this sort of shows the opposite of the

14  idea that they need the privilege document to do that.

15       Your Honor phrased it well, at one point you said,

16  *They can say no word came down from legal, and so we didn't*

17  *think we could not do this*.  There's nothing to prevent them

18  from taking the stand and testifying to that.  There's nothing

19  to prevent them from introducing the evidence in Bryan Meyers'

20  memorandum of interview that said they didn't talk about

21  topics.  That's very different from saying, *We get to take*

22  *privileged communications and see them and introduce them*.

23       So, no word came down from legal as something that

24  they can do without getting these privileged documents to be in

25  good faith.

1          Separately, you know, to be in good faith and to say,

2    that we were in good faith because, I think as you put it, they

3    contend, *Everybody knew what we were doing or this wasn't a*

4    *secret, and so since nobody stopped us we were in good faith*.

5    They can certainly make that argument, but, even that, to have

6    any sort of credibility, where you could think about taking an

7    extreme measure to get evidence, would require an assumption

8    that legal knew what they were doing in order to get the legal

9    privileged documents, and if they want to make that argument,

10   you know, with the jury with other employees, supposedly

11   knowing about all of this, the fact is the record is going to

12   show that, again, there was a huge gulf between the information

13   the defendants and this small group of employees had and what

14   anybody else in the company had, and you will see that they

15   were actively concealing it.  But even so, they can make that

16   argument, and they can assert a good-faith defense, but that

17   again doesn't require piercing the privilege, to say whatever

18   evidence they want to provide that somebody else in the company

19   knew about it.

20         Finally, you know, the good-faith defense, in general,

21   I think can be completely separated from the privilege

22   discussion, unless and until there's some basis that

23   contradicts these facts that I have just said, that they didn't

24   disclose to counsel.  So they wouldn't have a good-faith

25   defense as to counsel.

1        THE COURT:  All right.  Let me stop.  I want to hear

2   from the defendants, recognizing that, obviously, we're not

3   going to get to the end of this, but I want to hear from the

4   government first, only because -- and I think I have got this

5   right.  Let me put the record as I understand it.

6        Historically, the way this works is the government

7   issued various subpoenas, grand jury subpoenas, to Epsilon, in

8   the course of its investigation slash 'tions, plural, as

9   counsel for Epsilon has said, I absolutely believe there were

10  negotiations and discussions that followed the issuance of

11  those grand jury subpoenas.  Documents were returned, some

12  documents were not provided and were held back under a claim of

13  privilege, a privilege log was provided, and that DOJ policy

14  does not permit counsel, who stands before me, or those who

15  were doing the investigation, to challenge, if you would, or

16  seek to overcome the privilege, assuming that there is at least

17  a facially plausible claim of privilege, it stays there, and

18  remains to where the government, for a variety of policy

19  reasons that have nothing to do with the individual who is

20  prosecuting the case or the individuals who were online, one of

21  whom dropped off, and I assure you that's probably our fault

22  not hers, we have trouble holding connections, that you are now

23  here, because the case involves a matter that you are

24  prosecuting, but that what I just said is essentially where it

25  is, and the government is not professing to necessarily have a

1    dog in the hunt, other than the position of the government is,

2    in this case, as it is in all cases, that it wants to assure

3    that the defendants receive a fair trial and that the

4    government does not do anything that's contrary to law or the

5    Court's rulings.

6            MR. REYNOLDS:  Yes, sir.  May I approach the podium?

7            THE COURT:  Yes, absolutely.

8            MR. REYNOLDS:  Thank you, sir.

9            THE COURT:  All of that roughly right?

10           MR. REYNOLDS:  Yes, sir.  But if I may be heard --

11           THE COURT:  You may, you may.

12           MR. REYNOLDS:  -- a little more specificity on those

13   points.

14           Yes, Your Honor.  Essentially, obviously, the

15   government has significant equities in ensuring that its

16   dealings with the Corporation, in negotiating a deferred

17   prosecution agreement and individual defendants who are

18   criminally prosecuted that every -- all of those parties'

19   rights are respected, and specifically the Justice Manual

20   9-28.710 and '720, with respect to the question of privilege,

21   direct the Department of Justice not to condition the

22   cooperation credit or predicate cooperation credit on a waiver

23   of privilege.  So we are particularly fastidious about ensuring

24   that we didn't get anywhere close to any considerations along

25   those lines.

1          I do think, for the Court's consideration, if you

2   permit me to just expound on this a little bit, there were

3   certain steps that, anticipating this genuinely difficult

4   balancing of very important interests that the government took,

5   to make the most of what we could develop our investigation,

6   and complete the DPA and indict the individual defendants, and

7   as such, we respected the Corporation's representations about

8   the privileged nature, certain communications and didn't push

9   the envelope by virtue of those policy reasons in negotiating

10  the DPA.

11         At the same time, the government concurs, for what its

12  worth, with Your Honor's assessment that an advice-of-counsel

13  defense, as such, is simply not relevant here and that we are

14  in a good-faith or negating intent territory, if anything.  The

15  reason I mention that is because, as we were in discussions

16  with counsel for the individual defendants, way back when, this

17  subject came up, and the, sort of, best solution we were able

18  to come up with are these interviews, two of them, with

19  corporate counsel, in which, at least certain -- at least there

20  were certain factual developments which would head off the

21  advice-of-counsel defense, so that the government could feel

22  comfortable that we had investigated it, without treading on

23  privilege we're done.

24         So, the two interviews, the memorandum interview are

25  in the record, I believe, filed by one or possibly both sides,

1    and on that point there, otherwise, it is true, we are

2    shadowboxing a little bit here, because take counsel for the

3    Corporation, at his word, but we don't know what's in the

4    contents of these 10,000 communications.  We are very

5    comfortable with the extent of the investigation thus far, that

6    what we don't think that they are going to have some bearing,

7    but I mean, we can't know that with any certainty, of course

8    not.

9              We are, similarly, for what it's worth, not persuaded

10   that this good-faith, negating intent defense is persuasive to

11   us, will be persuasive to a jury, and we will fight over jury

12   instructions; that's down the road.

13             I suppose, if anything, given the concerns, the

14   competing concerns here, simply note a couple of facts, that if

15   the motion to quash is granted in its entirety, and we sort of

16   foreclose further discussion about this, this issue of 10,000

17   allegedly exculpatory privileged communications, forgetting

18   advice of counsel, but just exculpatory with respect to

19   potential good faith, negating the fraudulent-intent defense

20   defense may not go anywhere, but the issue may still come up in

21   litigation and down the road if there's a conviction, potential

22   appeal issue and so forth.  Your Honor is obviously well aware

23   of that, but that's a consideration in figuring out how to

24   resolve this.

25             And Your Honor did allude to the *WR Grace* case, which

1    I detected, sir, correct me if I'm wrong, with some skepticism,

2    potentially, but it's simply noted for the record --

3            THE COURT:  I have skepticism to the extent that it's

4    a matter of first resort; meaning, whenever there's a claim of

5    privilege and a claim of defense that those two events

6    occurring, in and of themselves, mean that there is a reason

7    for me to now take it in and *Shepherd* it, and you know, be on a

8    document-by-document basis, going yes, no, yes no, yes no.

9            Obviously, there are instances where, for -- whether

10   it be privilege or other reasons, I'm looking at things

11   in-camera, and I am not trying to say that, you know, looking

12   at things in-camera is not allowed or is somehow a copout or

13   anything else.  I'm just saying the fact that a Court, in

14   *Grace*, went to that, to resolve the particular dispute before

15   it, I think it would be too much to say that *Grace* establishes

16   the right way to proceed in all cases, that's all I'm saying.

17   I'm not -- I'm not -- I recognize that I'm being deliberately

18   vague about where the line is, and I am being deliberately

19   vague, because I think line drawing, that applies to all cases,

20   that's better left to things like the Circuit, because I don't

21   have to draw a line that pertains to all cases and all things.

22           I need to look at this case, make a decision as to

23   this case, and if it's right, it's right, if it's wrong, it's

24   wrong.  People are going to argue about it one way or the

25   other.  That's not really my concern.  It's giving it my best

1    call.

2            MR. REYNOLDS:  Understood, sir, and acknowledging it

3    is merely persuasive authority, not binding on this Court.  I

4    think, for what it's worth, just to make this record, we would

5    respectfully disagree with counsel for the Corporation that

6    there's binding Tenth Circuit law precluding or foreclosing

7    this kind of inquiry in cases that were, as I recall, cited in

8    counsel's brief *Serrano* and *Valdez v Montez*, those are quite

9    distinguishable insofar as one involves an armed-career

10   criminal, another involves a drugstore robbery, and a habeas

11   New Mexico state court --

12           THE COURT:  And I have not gotten into those, but I

13   don't disagree with you that the cases, they are just

14   different.  Especially, habeas.  Habeas is an animal unto

15   itself.  The facts in that particular case are ... I think

16   that's the one with the robbery ... individual invoked the

17   Fifth, then they tried to get to -- get to it through his

18   lawyer, and the lawyer didn't testify, and then in connection

19   with the habeas, the alleged confessor now decides to come

20   forward, and it's a state court case that's brought up on

21   habeas, and to try and draw -- well, to build the bridge

22   between that case and this one, Golden Gate isn't big enough.

23           MR. REYNOLDS:  Yes, sir, understood.  So otherwise,

24   briefly, I just offer a couple other observations about the

25   posture as you, sort of, think through where to go from here.

1    I will note that there are 10,000 privileged emails.  There's a

2    smaller subset that involve direct communication between

3    Mr. Lytle and Mr. Reger.  One potential approach could involve

4    some sort of subsidiary or shorter review of those.  I think

5    it's only about 2,000, something like that.  There's also the

6    possibility, and again I'm just sort of throwing out potential

7    notions, if this is helpful to the Court, of an upfront

8    in-camera review, which is separate from the question of

9    admissibility or there's the potential for disclosure of some

10   of those communications to, at least the defense, if not the

11   defense and the government.  We are not advocating that.  It's

12   just a possibility.  And then leave it to the -- at least the

13   defense, if not the parties, to cull from the 10,000, maybe the

14   four that they actually want to invite the Court to undertake

15   this balancing test that is articulated in *Grace* and other

16   cases.  These are possibilities.

17           Setting those aside, we simply flag, for the Court's

18   reference, the possibility of the issuance of an order under

19   Federal Rule of Criminal Procedure 502(d).  Specifically, there

20   was concern, completely understandably from counsel for the

21   Corporation, about what happens here doesn't stay here,

22   reverberates and potential collateral, civil litigation; who

23   knows what.  And as I'm sure the Court is aware, of course,

24   that's anticipated by 502.

25           This Court is empowered to tightly circumscribe,

1    beyond the existing protective order that exists in this case,

2    the potential impact of the piercing privilege, to the extent

3    that it's -- that it's ordered, as may be applied in other

4    cases in federal or state court.  So that is a potential

5    option, to the extent that we are balancing these two very

6    important competing interests and understandably, whatever

7    happens here, we don't want to have the adverse affect

8    beyond -- beyond what happens in this courtroom.

9         MR. CLEVELAND:  Can I respond to that, at some point,

10   Your Honor?

11        THE COURT:  I'm sure.

12        MR. REYNOLDS:  Thank you.  So otherwise, honestly,

13   Your Honor has already articulated the -- large of what the

14   government's interests are, but I thought it would be

15   constructive, at this point, at least to propose some of

16   these -- some of these ideas, given the posture of where we

17   are.

18        THE COURT:  All right.  All right.  And, Mr. Leedy, I

19   guess I will start with you.  We are at the noon hour, and as I

20   said I do have something at 1, and I don't view this as going

21   to finish this today; that being said, I don't want to go away

22   just having heard from the corporation.

23        MR. LEEDY:  Good.

24        THE COURT:  I do want to hear what you and Ms. Morgan

25   have to say, perhaps in a more condensed form, and then let's

1    figure out, think about -- honestly, I give you Tuesday,

2    Wednesday, Thursday, I'm fine.  I don't know that I need

3    government counsel flying all the way in here again.  You are

4    certainly invited to appear as your colleagues are, remotely.

5         MR. REYNOLDS:  Thank you, sir.

6         THE COURT:  But, do you have a preference, the two of

7    you?  I know you haven't thought about it, because I just

8    sprung it on you, but...

9         MR. LEEDY:  I can tell -- I agree, additional time is

10   going to be needed.  I can tell the Court, Tuesday is wide open

11   for me.  I will defer to out-of-town counsel, obviously,

12   because if I have to reset something on Wednesday, probably

13   easier for me to do that.  Ms. Morgan, let me know if it works.

14        THE COURT:  While they are looking, let me hear from

15   you.

16        MR. LEEDY:  Okay.  And I will endeavor to condense

17   this.  With regard to where I think we all started and what we

18   attempted to start with in our briefing, specifically, with

19   regard to specificity, relevance and admissibility.

20        I guess, you know, from the back to the front, we've

21   talked about in-camera review, that would require documents

22   established to be privileged, and then being reviewed for

23   exculpatory information, arguably.

24        The first part hasn't been done, in my mind, based on

25   the logs that we have.  Privilege has not been established for

1   the 10,000-plus communications that you have very brief

2   summaries of.

3           It's been asserted that they are privileged, DOJ

4   accepted that representation to, I think, a great extent.  The

5   Court has no further information on those.  It needs that

6   information to determine privilege.  It can't, with the

7   descriptions that we have; that's simply where we are at this

8   point.

9           So, before the Court would engage in any review of

10  these documents, the documents would have to be established to

11  be privileged, and we have tried to outline limitations of the

12  three privilege logs.  I would like the Court to take note of

13  how those three privilege logs differ.

14          Privilege log one, Your Honor, we resubmitted these in

15  a reformatted, hopefully legible, format in **Document 120.**

16          They started out as logs that contained both redacted

17  communications, redacted for privilege and withheld

18  communications.  And in the first log, we have a fair amount,

19  the majority of which are actually redacted.  So, in effect,

20  the determination of privilege -- can I get the ELMO setup --

21  would allow somebody to look at something like that, where

22  there are, obviously, the recipients, the time in which the

23  communications was sent, non-privilege information being

24  highlighted, redacted information, alleged to have been

25  privileged, and that's the type of analysis the Court could

1    engage in with regard to whether or not, I guess, this would

2    have been okay to keep from us, based on privilege.  That's a

3    redacted document.

4          In logs two and three, and just by, I guess, a

5    demonstrative example, we have about 300 communications in log

6    one, which includes both redacted and withheld documents.  We

7    have about 10,000 documents in logs two and three, which are

8    all withheld.  Not a single one redacted for privilege.  So

9    that context, that I just showed the Court, as an example, we

10   don't have.  We have no idea what it says.  We have no idea

11   what was redacted in there for privilege, what wasn't

12   privileged.  The entirety of those documents were withheld

13   based on privilege, and that was okay with DOJ; that's not the

14   analysis that has to be conducted here.

15         To establish privilege the holder of privilege, the

16   Corporation, has to show the Court that they are, in fact,

17   privileged, and the charts that we have, the summaries that we

18   have, those descriptions, simply doesn't meet muster.

19         If we had 10,000 communications, all of which looked

20   like this, with the privileged part redacted, and the

21   non-privileged part present, this would be a different and, I

22   think, more efficient exercise, because we would be telling the

23   Court, Well, they assert this is privilege.  This is

24   communication from Kessler to Bryan Meyers, about an order from

25   Micromark, post dating the restraining order.  We think it's

1    exculpatory, review it in-camera, get the clean copy from

2    Epsilon and tell us if we can have it or not, and we will make

3    a record on that.  You can't do that with what we have.  And

4    you need to have that to establish privilege, and you need have

5    that to establish any sort of in-camera review proceeding,

6    which actually, you know, in this District has been undertaken

7    in different context.  It's been undertaken in a context where

8    the reason for the withholding of information was based on

9    National Security, and Judge Kane went through the exercise of

10   doing that in-camera review for *Brady* purposes

11   document-by-document but only after we had the first

12   establishment of the National Security call it privilege, but

13   it really was exclusion from discovery, put in front of us.

14           I think the Court knows what I'm talking about and the

15   case that I'm referring to, and it's been done and it's not

16   done in some other District, it's done in this courthouse.  But

17   the thing what was done beforehand was establishing the reason

18   for every single document, why it wasn't turned over to begin

19   with.

20           *THE COURT:*  All right.  Let me just respond to some of

21   that.  Sometimes the record doesn't -- doesn't reflect when I'm

22   smiling.  I was going to say, I'm smiling, maybe I will get

23   Judge Kane to look at all of these documents.

24           There is an equivalency that's being assumed here that

25   I don't know why anyone is assuming it.  What I mean by that is

1    this, you have got a classified information scenario, what you

2    are dealing with then is a dispute between the government, the

3    prosecution and the defendant, and the government being

4    obligated to provide exculpatory information to you.  The third

5    party has no obligation to give you anything, exculpatory

6    inculpatory.  I mean, they are not bound by *Brady* to where

7    there's some requirement that they, you know, satisfy your

8    defense needs.  I don't mean to suggest by that that you're

9    left without recourse.  I'm just saying, to create this

10   equivalence of, look, if the government were withholding this,

11   there may be a scenario in which you would be required to look

12   at it, without regarding to how many it is.  I get that.  I'm

13   just saying, the fact that it exists in that context does not

14   mean that with respect to a Rule 17 subpoena, that is the way

15   that these things should be resolved, because the second I do

16   that, what I'm doing is saying, in essence, I will resolve the

17   discovery dispute, because whether or not it is producible or

18   not producible, whether or not you get to see it or don't get

19   to see it, I will resolve that.  Not on the basis of some

20   refined request for document X, but on the basis of, *There's*

21   *stuff in that pile that might be useful to us, so, Judge, go*

22   *through the pile and tell us whether or not there's something*

23   *useful to us that's in there*.  That's a very different animal

24   than a scenario where the allegation is that the government is

25   withholding exculpatory informant information, classified

1    information, the other ways that this thing comes up.

2            So, to the extent you see me kind of pushing back from

3    warmly embracing the notion, it is not because I think that it

4    is so unusual to have a Court review things.  It's that this

5    does not -- this circumstance is not an equivalent to a

6    scenario were you are looking at the government withholding

7    something for some reason, and its obligations under *Brady vs.*

8    *Maryland, Giglio*, wherever else it comes from, is being

9    implicated.

10            *MR. LEEDY:*  I understand and perhaps the explanation

11   was less than perfect.  The trigger really wasn't important in

12   that scenario.  What I was trying to get to is the process

13   through which the Court gets to be doing an in-camera review of

14   documents; meaning, assertion of something has to be

15   established why it's not produced, regardless of the trigger

16   for production, it has to be established first.  In that case

17   is was National Security.  Here it's the privilege that's been

18   alleged.  The Court doesn't have the information --

19            *THE COURT:*  No, no, no.  I don't see it that way.

20            *MR. LEEDY:*  Here is where I was trying to work this

21   from the back/front.  Now I'm to the validity of the Rule 17

22   subpoena, which is why this should be turned over, and that's

23   the trigger that we're asking for production, based on.

24            So that's how it gets to where I think we should be,

25   which is, 10,000 communications that are redacted and not

1  withheld.

2          THE COURT:  All right.  Let's assume that none of it,

3  not a lick of it, not a line, not a letter, not a page, none of

4  it is privilege.  Why do you get to say, *Hey, the government*

5  *asked for it, you didn't give it to them, give it to us,*

6  *because you didn't give it to them*?

7          MR. LEEDY:  I will tell you why we're asking for it,

8  and this -- this is the basis for the request.  It's because it

9  meets the specificity and admissibility under relevance

10  requirement understand Rule 17, and I can tell you why.

11          THE COURT:  Tell me.

12          MR. LEEDY:  Here we go.  What the government asks for

13  was not generic.  The grand jury subpoenas were far from that.

14  The grand jury subpoenas asked for records in Epsilon's control

15  related to 54 Epsilon accounts.  I have got a feeling, Epsilon,

16  being the size of the corporation it is, had a lot more than 54

17  accounts at the time this request was made.

18          THE COURT:  Fair enough.

19          MR. LEEDY:  Fifty-four accounts that were being

20  criminally investigated, at the time of their request, for

21  fraud, which included 23 accounts that are directly cited in

22  both the Indictment and the *James* log.  So 23 out of the 54

23  Epsilon accounts they asked for are named in discovery all over

24  the place in the *James* log and in the Indictment.  More than

25  half.  But all of which were being criminally investigated for

1    fraud at the time these documents were asked for.

2         Here's what the subpoenas cover, communications

3    related to those 54 accounts with consumers, representatives,

4    governmental or regulatory agencies, and materials from Epsilon

5    received from those accounts, including mass-mail

6    solicitations, print advertisements and records identifying

7    brokers with whom Epsilon had a business relationship, that's

8    why they were asking for these records, because they were

9    investigating those 54 accounts for the same type of fraud

10   that's alleged in this case.

11        THE COURT:  I get that.

12        MR. LEEDY:  Second, what they asked for, the

13   specificity of these subpoenas, communications related to

14   opportunistic clients, including those who had disseminated

15   creative content regarding lotteries, sweepstakes and

16   astrology; 23 of which are named in the *James* log or the

17   Indictment.

18        Subpoenas cover communications related to, here we go,

19   good faith, guidelines for review of creative content and

20   compliance with those materials, as well as communications

21   related to complaints or inquiries.

22        Here's what Epsilon did, when it made those logs, it

23   said, this stuff, these 10,000 communications are responsive to

24   your subpoenas.

25        THE COURT:  Yeah.

1          *MR. LEEDY:*  But we are not going to give them to you,

2     because they are privileged, and so that is the specificity --

3          *THE COURT:*  Here is the reality, maybe it relates to

4     the ones in the Indictment, maybe it doesn't, maybe it's

5     entirely inculpatory, maybe it's entirely exculpatory, maybe it

6     relates entirely to an issue that does come into trial, maybe

7     it doesn't.  There's a whole lot of maybes built into this, and

8     it amounts to a request where you are saying, *I'm not going to*

9     *give you specificity, in terms of what I need for a defense,*

10    *I'm going to derivatively stand in the shoes of the government.*

11         I tell you this without having -- I don't mean this as

12    a matter of pure fact or legal conclusion that I would -- that

13    I want to be held to, but if the government had the right to

14    challenge, it would be looked at by me in a different context

15    than the way I look at it coming from you, because if the

16    government had the right to challenge and pursued the right to

17    challenge.  The question would become, *is this relevant to the*

18    *investigations, broadly.*  That's not what you are saying to me?

19    You are saying, *It's relevant to the defense, narrowly.*

20         *MR. LEEDY:*  So --

21         *THE COURT:*  Those two things don't have to be true.

22         *MR. LEEDY:*  Well, here is what I -- well, I think,

23    specificity is, did we tell them what exactly we are asking

24    for, with enough specificity?

25         *THE COURT:*  And here's what you told them, *Give me*

1    *what they asked for.*

2         MR. LEEDY:  No.  *Give me what you didn't give them*

3    *after they asked for it.*

4         THE COURT:  Okay.  Fine.

5         MR. LEEDY:  Which is vastly differently.  They said it

6    was responsive, then didn't turn it over; that is the

7    specificity requirement met.  The communications are outlined

8    in the logs that they provided.

9         THE COURT:  If they gave everything to the government,

10    all of it, all 10,000 pages, what leads you to believe that the

11    government would have given two pages to you?

12         MR. LEEDY:  Oh, what the government has told us about

13    what they have given us.

14         THE COURT:  I'm not trying to be cute here.  It's,

15    sort of, the fact that they give them some stuff, it doesn't

16    mean that it's necessarily relevant to the defense.  It doesn't

17    mean that it's relevant to the trial.

18         Investigations start broad and then they narrow to

19    charges and then it narrows to defenses, and it's a process of

20    contraction.

21         MR. LEEDY:  This isn't -- we are not under Rule 16 or

22    *Brady* or anything like that.  We are under Rule 17.

23         THE COURT:  I don't know what we're under, because you

24    basically saying, *Give us the stuff that they should have had*

25    *as part of their investigation.*

1          MR. LEEDY:  No, no.  They never asked for it.  Once

2    they had the assertion of privilege, they never asked for it.

3    I'm going to take that back.  They did ask for some stuff, and

4    I will tell when I learned this.  July 15th.  After the

5    government read our response to their motion to quash, it said,

6    *Oh, now we kind of understand why you are looking for this*

7    *stuff.  We had some conversations, follow-up conversations,*

8    *about these logs, and asked for additional information from*

9    *Epsilon.  Epsilon gave it to us.*

10          So in certain instances the government did pushback on

11    some of the privilege, got additional information, and I have a

12    letter saying that.  I don't have any additional discovery

13    presented, but a summary of it.  So, in certain instances they

14    did.

15          The fact that the government didn't push back on the

16    privilege assertion, doesn't change our ability to request

17    these documents under Rule 17.  They can decide to ask for what

18    they want and accept a privilege representation when they get

19    it; that's not where we are.

20          THE COURT:  I understand that.

21          MR. LEEDY:  Under the -- I think it's an even easier

22    list of requirements to meet, under Rule 17, which results in

23    them giving us specific, admissible and relevant documents,

24    unless they are privileged, and what the Court needs to figure

25    out first is, how it can establish that privilege based on

1      simply the generic representations we have, and the

2      descriptions of the 10,000 communications in the privilege

3      logs, and it can't, and that's being, I believe, stepped over

4      in this instance.

5           Just because the government didn't pushback and say,

6      Oh well, show us how this entire 500-page document is

7      privileged, and then, you know, I guess you won't have to turn

8      it over.  That's not something we can jump over at this point.

9      If it is specific enough, it's relevant and admissible --

10          THE COURT:  I guess what I'm saying to you, is I am

11     yet -- I'm not yet convinced that it's specific enough.

12          MR. LEEDY:  The specificity of the request?

13          THE COURT:  I mean what you really are saying is, *Give*

14     *me all of the stuff that you would have given to them*.  Okay.

15     Why is that something that you get?  Why is it that everything

16     that they got -- that they could have gotten in grand jury,

17     should now be provided to you?  What I mean by that is, you are

18     not -- you didn't ask for, give me communications between my

19     client and legal counsel, or give me communications from my

20     client and legal counsel with respect to X.  You basically

21     said, *Hey, I want you to give me the stuff that you didn't give*

22     *them, so we can finish looking at it*; and finish, in essence,

23     the investigation that the government should have done or maybe

24     should have done, could have done, should have done, might have

25     done, may have done ... how does that work?

1       MR. LEEDY:  That's not what we asked for, actually.

2  What we asked for was give me the 10,000 communications that

3  you listed were responsive to the subpoenas asking for

4  communications related to 54 accounts that were being

5  investigated for fraud, at the time that the subpoenas were

6  issued, and communications --

7       THE COURT:  You don't see the gap.  The gap, in my

8  mind, is the fact that it may have been responsive to the

9  subpoena does not mean that it goes to you.  It's not the case

10 that everything that a grand jury inquires about, goes to you.

11      MR. LEEDY:  It's the specificity of the subpoena that

12 gets us there.  It's the specificity of their saying these are

13 all responsive communications --

14      THE COURT:  To what?  To what?  Let's assume it's

15 responsive to the response.  All right.  Why does that get it

16 to you?

17      MR. LEEDY:  Because the responsivity to the subpoena

18 means it's relevant and admissible based on the descriptions I

19 just gave, Your Honor.

20      THE COURT:  No.  It means that it might be.  It's -- I

21 mean, relating to X, Y and Z doesn't mean it's coming in.  I

22 mean, I just think that you are piggybacking on their subpoena,

23 and saying to Epsilon and to me, *Hey, they asked you for stuff*

24 *relating to a grand jury subpoena that was responsive.  You*

25 *withheld this stuff, which, by virtue of the fact that you put*

1   *it in a log, means it was responsive, therefore, we get it,* and

2   I don't think that's the way things should work.

3           Instead, you should be asking for something specific,

4   and I understand you are telling me that you did, that relates

5   to a defense that I can analyze it, in terms of whether it is

6   relevant, admissible, not a fishing expedition.  You are

7   casting your net saying, *Hell, let us do the grand jury*

8   *investigation that they didn't do, and then we will decide, you*

9   *know, maybe we will find some stuff, maybe we won't.*

10          I don't think that you can stand in the shoes of the

11  government conducting a pre-Indictment investigation, and say,

12  *Those shoes fit me now, as a defendant, in a post-Indictment*

13  *need for trial.*  Those are -- those can overlap, but they can

14  overlap substantially, they can overlap entirely.  They can

15  also be completely separate from each other, in terms of what

16  comes over you.  Part of it is, I don't know what the answer

17  is.

18          MR. LEEDY:  Right.

19          THE COURT:  But the way that this is all being pitched

20  is, *Hey, you know, if this is correct, then any time that*

21  *anything is withheld from a grand jury, you can say hey, if*

22  *they didn't give it to them, you should let the Court look at*

23  *it, or you should let us look at it*, and I am not sure how I

24  line that up with a third party, not the government, a third

25  party, and their obligations to respond to a subpoena that's

1    issued on them.

2         *MR. LEEDY:*  This is self-identification by the third

3    party of communications that are -- that are responsive to the

4    exact language of the subpoena that I just read you.  That's

5    why this list got made.  *We have this.  It's responsive to what*

6    *you asked for.  We are not going to give it to you based on*

7    *privilege.*  And here is what I will also tell Your Honor, that

8    there are subcategories of these, and we have, like we wrote in

9    the motion, categories of groups of communications within these

10   10,000 communications that can be readily identified.  One of

11   those communications, about 3,000, where no attorney is

12   identified in the recipient part.  There's just not a

13   representative of legal department in those.

14        *THE COURT:*  Like I said, you -- you all think that the

15   issue for me is whether or not they are privileged or not.  I'm

16   not even sure I'm there yet.

17        Look, part of the reason I'm being how I'm being is

18   because I'm wired that way.  I guess I'm channeling Jessica

19   Rabbit if you remember that reference, but putting that to the

20   side, part of the reason is I also know that we are not going

21   to finish this today.  I have to give my staff an opportunity

22   to eat, and I wanted to give you a fair opportunity of what's

23   going on in my head.  I'm not saying it's right, wrong, I'm

24   saying it's what's going on in my head right now.  You have an

25   opportunity to chew on it, they have an opportunity to chew on

1    it.  I don't know what the government is doing.  I'm going to

2    call what they are doing gumming it, because they are not

3    putting teeth into it, but they are moving their jaws.

4         So, and then we will come back together, Tuesday,

5    Wednesday, Thursday, tell me?  You can have the day.  Pick it.

6         MR. MEHLER:  I would say Thursday works for me.  I

7    don't know that that day works for everyone else.

8         MR. LEEDY:  Your Honor, I'm unavailable Thursday.

9         THE COURT:  That doesn't work.

10        MR. LEEDY:  Tuesday or Wednesday.  I can move whatever

11   I have on Wednesday.  Tuesday I'm wide open, as of now.

12        MR. MEHLER:  I have a hearing on Wednesday.

13        THE COURT:  Let me do this.  You let -- you call my

14   chambers and you let me know whether it's Tuesday or Wednesday

15   and whichever one of the two days it is, be here at 9 o'clock.

16   In the absence of an agreement, it's Wednesday.  All right.

17        MR. CLEVELAND:  Can I make one request?

18        THE COURT:  Yes.

19        MR. CLEVELAND:  Could we set it for 10, in case some

20   people have to fly in?

21        THE COURT:  That's fine.  10 o'clock.  All right.

22        MR. CLEVELAND:  For the record, we're available

23   Tuesday or Wednesday.

24        THE COURT:  You can work it out.  Call Deanne.

25   Government, again, you are more than welcome, here, and I don't

1    mean to suggest that -- that anything that you have said has

2    not been helpful, because it has.  You can also appear

3    remotely, and maybe you will have better luck than Ms. Doud, in

4    terms of holding the connection.  We just seem to have problems

5    with it.  It comes, it goes, it comes, it goes, but I'm

6    assuming that, at least, two of you are online one of you will

7    maintain a consistent connection.

8         *MR. REYNOLDS:*  Your Honor, I will probably be here in

9    person.

10         *MR. MEHLER:*  Judge, before you go, would it be

11    possible for my client to appear by video?

12         *THE COURT:*  Absolutely.  Absolutely.  Get with Cathy.

13         *MR. MEHLER:*  I will.  Thank you.

14         *THE COURT:*  Recess.

15         *THE COURTROOM DEPUTY:*  All rise.  Court is in recess.

16      (Recess at 12:31 p.m.)

17                      **REPORTER'S CERTIFICATE**

18      I certify that the foregoing is a correct transcript from

19    the record of proceedings in the above-entitled matter.  Dated

20    at Denver, Colorado, this 8th day of August, 2022.

21

22                                  *S/ Tammy Hoffschildt*
                                   Tammy Hoffschildt
23

24

25