# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Case No.  21-cr-00192-RM

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1.  **ROBERT REGER**, and
2.  DAVID LYTLE,

     Defendants.

## GOVERNMENT'S SENTENCING STATEMENT

The Government, by and through undersigned counsel, files this Sentencing Statement for defendant Robert Reger.

This is a case about a corporate executive who used the sophisticated technology and legitimacy of his corporate employer to help scammers identify victims.  After a two week trial, a jury in the District of Colorado returned a verdict of guilty as to fourteen counts charged in the Superseding Indictment against the defendant.[1]  As a result, the defendant now stands before the Court as a convicted felon for one count of conspiracy to commit mail and wire fraud, six counts of wire fraud, and seven counts of mail fraud in violation of 18 U.S.C. §§ 1341, 1343, and 1349.  Reger was convicted of conspiring to commit wire fraud and mail fraud in an intentional scheme to sell data for consumer frauds for nearly 10 years.  By selling data to fraudsters for nearly a

---

[1] The government proceeded to trial with fourteen counts against Reger, although the Superseding Indictment originally charged eighteen counts.

decade, Reger caused victims—who were often elderly and vulnerable—to lose millions of dollars. He was also convicted of engaging in a scheme to defraud that constantly used interstate wires and the mail to defraud those victims.

The government requests that the Court impose a **sentence of imprisonment within the Guidelines range of 262 to 327 months, followed by three years of supervised release, and a substantial fine tied to the millions in loss**. The government is not seeking restitution at this time because the defendant's former employer, Epsilon Data Management, LLC, already committed to, and is in the process of, providing financial compensation to the hundreds of thousands of victims impacted by the defendants and the criminals with whom they coordinated.

In support of its request for the above sentence, the Government sets forth the following analysis of the applicable U.S. Sentencing Guidelines along with the various sentencing factors set forth in 18 U.S.C. § 3553(a).

## I.  <u>Related Cases and Procedural History</u>

The defendant's co-conspirator and colleague Steven Fritz Kessler pleaded guilty to conspiracy to commit mail fraud in September 2018. *United States v. Kessler*, No. 18-cr-435-RM (D. Colo.). In January 2021, the defendant's longtime employer, Epsilon Data Management, LLC, admitted that the business unit Reger created and oversaw, the Direct to Consumer Unit, engaged in a longtime scheme to defraud by selling "consumer data to dozens of 'opportunistic' clients [employees, including Reger] knew were engaged in fraud." *United States v. Epsilon Data Management, LLC*, No. 21-cr-0006-RM, Dkt No. 2-1. The consumers targeted by the scheme were called "opportunity seekers," and "frequently fell within the same demographic pool: elderly and vulnerable Americans." *Id.* at ¶ 9. Epsilon admitted that, from 2008 to July

2

2017, the "DTC Unit sold data associated with more than 30 million American consumers to clients engaged in fraudulent mass-mailing schemes." *Id.* at ¶ 17.  As part of the deferred prosecution agreement, Epsilon paid $127.5 million into a victim compensation fund administered by a claim administrator, to be returned to victims of fraudulent schemes assisted by Epsilon, along with a $22.5 million criminal penalty.

A grand jury in this district indicted the defendant and co-conspirator David Lytle in June 2021.  Dkt No. 1.  Another federal grand jury approved a 27-count superseding indictment in November 2022.  Dkt No. 175.  In advance of the January 2023 trial date, the government dismissed seven specific mail and wire fraud counts.  Dkt. No. 217.  The parties appeared for trial in January 2023 and again in January 2024, and ultimately trial commenced in May 2024. The government presented 18 witnesses, and eight witnesses testified for the defendants, including defendant David Lytle.  On May 28, 2024, the jury returned a guilty verdict on all counts of the superseding indictment that were presented at trial.  The Court polled the jurors individually, and each affirmed their agreement with the verdicts.

## II. Facts

### A. Background

Robert Reger worked in the data practice of Epsilon Data Management, LLC, a large marketing company that sold consumer information to clients for marketing purposes.  Epsilon's data practice was based in Colorado, with thousands of clients across the United States.

Epsilon's data practice collected and sold consumer information.  Epsilon used sophisticated modeling based on the data it collected to help clients identify new potential customers.  Central to this case was Epsilon's collection of clients' "transactional data," meaning

records of individuals who purchased the clients' products in the past. Epsilon used that data to predict who would purchase a similar client's products. Epsilon's clients paid Epsilon to provide targeted lists of potential customers for their mailings.

Reger came to Epsilon with extensive experience in the mass-mailing industry, including deceptive and misleading sweepstakes mailings. Before working at Epsilon, Reger held several jobs as a copywriter working on sweepstakes mailings. Gov. Ex. 275B. Reger worked as a Senior Copywriter for American Family Publishers Division, where, according to Reger's resume, he "[g]enerated winning concepts and copy for all Time Inc., American Family Publishers sweepstakes and book/magazine/video/merchandise direct mail promotions." Although not admitted at trial, there is ample documentation that American Family Publishers was a deceptive sweepstakes company much like those discussed at trial. *See, e.g., In re Am. Fam. Enters*., 256 B.R. 377, 386 (D. N.J. Sept. 11, 2000) (detailing the dozens of suits and settlements with 40 state attorneys general); **<u>EXHIBIT A</u>** Settlement Agreement, *Florida v. Am. Fam. Enters., et al*, Case No. 98-00778 (Thirteen Jud. Cir. Hillsbourough Cty, Fla.) (June 15, 1999) (settlement agreement prohibiting misleading statements essentially identical to those discussed in the Reger/Lytle trial); Complaint, *West Virginia v. Am. Fam. Publishers et al.*, C.A. No. 98-E-1093 (Cir. Ct. Kanawha Cty, W. Va. Apr. 29, 1998); Gov. Ex. 886 (rejected for admission in government's case in chief at trial).

Reger worked at Abacus Direct, which later became part of Epsilon, from 2002 through 2004 and again starting in 2005. In the mid-2000s, Reger helped start a new unit in Epsilon's data practice. That unit was initially called the Solo Continuity, or SoCo, Unit, and was later renamed the Direct to Consumer, or DTC, Unit. The DTC Unit specialized in serving clients

that advertised and sold products by mailing solicitations to consumers. Those clients tended to market to an older, lower income, demographic.

Reger initially performed a business development role in this unit, signing up new clients. In 2007, Reger was promoted to Vice President supervising the DTC Unit. In late 2010, Reger became Senior Vice President, a supervisory position overseeing sales in the DTC Unit as well as other units. The DTC Unit was the largest of the units Reger supervised in terms of revenue. Reger hired co-conspirator Kessler as an Account Executive in the DTC Unit and later promoted him to Vice President. Together with Kessler, Reger also participated in hiring his co-defendant David Lytle. Reger directly supervised Kessler throughout the conspiracy. Defendant Lytle, in turn, reported to Kessler, directly until 2016 and then with a "dotted line."

Reger was compensated with a salary and a commission, which depended on hitting a revenue target. Between 2008 and 2016, Reger earned a total of $2,089,910 in base pay. From 2008 through 2017, Reger earned a total of $1,296,892.19 in commissions. Gov. Ex. 276.

### B. The Scheme to Defraud

From in or around 2008 through in or around January 2018, Robert Reger, David Lytle, and others conspired to commit wire fraud and mail fraud and committed wire fraud and mail fraud. Specifically, through his work in and with the DTC Unit, Reger, along with Lytle, Kessler, and others, sold targeted lists of consumers and their addresses to clients they knew were sending false and fraudulent mail pieces to consumers. These mail pieces included "sweepstakes" mailings, which falsely appeared to be personalized formal communications and were designed to trick consumers into believing they had won money, which they could claim by sending in a fee. These mail pieces also included astrology mailings, which, among other things,

led consumers to believe they had been specially selected to receive the mailings because an astrologer or psychic had experienced a vision about them and would provide personalized information about them in exchange for a fee. The DTC Unit required clients to provide samples of their mail pieces as part of the onboarding process. The DTC Unit and other at Epsilon used those mailings to assess the type of customer the client was trying to target.

Fraudulent sweepstakes and astrology clients were categorized within the DTC Unit using the euphemism "opportunity seekers." Reger's DTC Unit served these types of fraudulent clients from the time Reger founded the Unit until late 2017, after Reger had left the company. The opportunity seeker category, which included fraudulent mail clients, generated approximately $2.3 million in revenue for the DTC Unit in 2011. That amount remained roughly the same in 2016. Gov. Ex. 177A. As Vice President and later Senior Vice President supervising the DTC Unit, Reger had the authority to decide whether to allow certain clients or types of clients. Under Reger's leadership, the DTC Unit continually sold data to clients sending fraudulent mailings.

Reger knew the DTC Unit was serving these types of clients and approved doing so. For example, Kessler testified that, in or around 2008, he raised concerns to Reger about a mailing for an astrology client, Destiny Research Center, that purported to be from a famous psychic and sell a supposedly ancient Egyptian ring that would protect its wearer. Reger dismissed Kessler's concerns and told him that if Kessler did not want to service the account Reger would find someone else to do so. Destiny Research Center was subsequently shut down by the government for engaging in fraud. Similarly, in 2015, Kessler raised concerns about a new client that made "extreme claims," noting that "the law caught up with [Destiny Research Center] and shut them

down recently" and he thought it would catch up with the new client as well.  After Lytle advocated for the client and Kessler agreed that they would keep taking the clients that came to them, Reger responded, "Ok good . . . thx all for the help w this."  Gov. Ex. 6.

In September 2016, employees in the DTC Unit circulated emails discussing actions against some of their clients and others engaged in mass mailing scams.  These emails included a link to a press release from the Department of Justice with a headline that referenced "Civil and Criminal Actions to Dismantle Global Network of Mass Mailing Fraud Schemes Targeting Elderly and Vulnerable Victims."  In one of these email chains, which included Reger, Lytle, and Kessler, David Andrews, a Business Development Manager in the DTC Unit, stated: "Not sure what we do with BDK"—a client of the DTC Unit that was mentioned in the press release—"but legally might make sense for us to distance ourselves from them."  Andrews said he was "forwarding to the whole team"—*i.e.*, the DTC Unit plus Reger—"because I think we all need to be in the know," but was "not sending to legal or anyone higher up than Rob" and would "leave that to you guys (Fritz/Rob) to decide what you want to do about any of this."  Gov. Ex. 14.

Reger responded to one of the emails discussing the scams shut down by law enforcement, saying of a former client: "We all knew he was crooked."  Gov. Ex. 17.  In response to an email from Kessler a few days after the Department of Justice press release informing Reger of the potential revenue impact of the legal actions, Reger stated: "Yep, I know all about it."  Gov. Ex. 18.  Evidence at trial showed Reger did not forward the press release to Epsilon's legal department or any of his superiors at the company and did not tell them about the legal actions.

In January 2017, the Department of Justice contacted Epsilon's legal department about an investigation concerning certain of the brokers that worked with the DTC Unit and serviced fraudulent clients. Soon thereafter, the Department of Justice sent Epsilon a subpoena. Epsilon's general counsel, Lisa Gallerano, then sought to learn what the DTC Unit did with the brokers at issue. As the Senior Vice President supervising the DTC Unit, Reger was identified to Gallerano as the most knowledgeable person. Even then, Reger did not inform Gallerano of the legal actions involving DTC Unit clients and brokers that had been announced in September 2016. Instead, Reger withheld information from Gallerano and, when Gallerano independently received the September 2016 press release, falsely suggested that he was seeing it for the first time. Through his responses to Gallerano's inquiries, Reger also led Gallerano to believe that the brokers were no longer servicing the scam clients the Department of Justice was concerned with, which was false. Reger left Epsilon in March 2017.

As a result of Reger's concealment and misrepresentations, Epsilon continued to sell data to clients engaged in fraud until late 2017.

As the direct or indirect supervisor of the DTC Unit for the entire period of the conspiracy, Reger was responsible for its sale of consumer data to clients that defrauded people. Reger helped start the unit, which serviced those types of clients from the beginning. He did not take action to stop the DTC Unit from servicing those clients even after learning that many such clients had been accused of committing mass mailing fraud. Instead, he allowed the fraud to continue while concealing this information from Epsilon's legal department and his superiors.

## C. Wires Reflecting the Targeting of Thousands of Potential Victims

For the purpose of executing the scheme described above, Reger caused and assisted in

causing wire communications to be transmitted in interstate commerce, including those specified in Counts 2, 5, and 7 through 10 of the Superseding Indictment (Dkt. No. 175). These wires include emails transmitting consumer data to clients sending deceptive mailings and other emails in furtherance of the scheme.

### D. The Mailings from Victims

At trial, the government proved that Reger caused or was responsible for payments mailed by several elderly and vulnerable victims. These mail fraud counts, Counts 20 and 22 through 27 of the Superseding Indictment, were a handful of instances of the fraud that ran for years and involved countless mailings – the evidence at trial showed that the DTC Unit in fact sold the names and addresses of millions of potential victims to clients that sent fraudulent mailings, and these schemes resulted in tens or even hundreds of thousands of people being defrauded.

### E. Relevant Conduct

Evidence at trial showed an extraordinarily broad scope of jointly undertaken criminal conduct that was part of the defendants' scheme and reasonably foreseeable to the defendants. U.S.S.G. § 1B1.3(1)(B). The relevant conduct includes numerous fraudulent mailers that each sent tens of thousands, if not millions, of letters to consumers. A selection of the fraudulent mailings were introduced at trial in Government Exhibit 404, a summary of some – but certainly not all – of the deceptive mailers that Lytle recruited, the defendants profited from, and whose victims were reasonably foreseeable by the defendants. U.S.S.G. § 1B1.3 Application Note 4(C)(ii).

### F.  Actual Loss

At trial, the government proved that Reger and Lytle caused reasonably foreseeable losses amounting to millions of dollars from victims.  By any measure, the defendant's crime of conviction resulted in actual losses of millions of dollars to numerous victims.  Conservatively measured, a reasonable estimate of actual loss is greater than $10 million, although there is evidence the amount is significantly greater.  The defendants' conspiracy sold data to dozens of scams, *see, e.g.*, Gov. Exs. 4B-4T, each of which mailed to tens of thousands if not millions of people, seeking money based on false premises.

For example, Shaun Sullivan testified that his criminal scheme, Registered Disbursement Division ("RDD"), made approximately $30 million from victims.  Exhibits showed that the defendants sold more than 4 million consumers' names and addresses to the RDD scheme, *see* Gov. Ex. 403, which sent fraudulent prize notices seeking $20 or $25 payments from victims.  Sullivan testified that the fraud needed at least a 3% response rate to break even on costs, and invoices admitted at trial showed that RDD, through list broker Jill Castellano, purchased Epsilon lists over and over for years.  *See* Gov. Ex. 283.  Sullivan also testified that he needed 3% of recipients to respond to the "front-end" mailing, and that these victims would then receive many more "back-end" mailings, each seeking to defraud them again.  Evidence from victims at trial showed that some victims repeatedly sent in checks to RDD, as many as eighteen times in the case of William Shaw.  Gov. Ex. 406.  Thus, the loss from the defendants' sale of data to RDD is calculable from the 4 million names, which resulted in *at least* 120,000 victims (3% of 4 million) who sent in at least $20, for a total of $2,400,000 loss from the front-end mailings.  With even a conservative estimate that these victims only paid RDD twice on average, the defendants

caused $4.8 million of loss, equal to 16% of RDD's total $30 million proceeds. This sum represents the proceeds of millions of individual attempts to defraud U.S. consumers by a single client of the defendants. Moreover, this is actual loss, not an intended loss figure. The defendant's objective was to sell more data to more clients – regardless of whether the mailings were fraud. The limiting factor was the effectiveness of the scam, rather than any intention to stop defrauding people after a certain sum. Although the government does not propose using intended loss in this case, an intended loss measure – taking into account all of the clients' attempts to defraud the victims - would be substantially higher. By multiple measures, the full actual loss is within or above the proposed loss range of greater than $9.5 million. For example, analyzing DTC revenue from sales of consumer data to select scam clients yields a loss estimate over $10 million. Epsilon records show that revenue from sales to these scam clients was $2,100,000 in data sales from 2012 to 2017.[2] **EXHIBIT B** [GOV01-01141413]. The DTC Unit charged between $45 and $85 per thousand names. Def. Ex. X-67. Assuming $80 per thousand names on average, this means that more than 26.25 million names were sold to these scams during just the second half of the conspiracy, when Reger and Lytle worked together at Epsilon. Of course, the number of consumers targeted and loss over the entire 10-year conspiracy is much

---

[2] This revenue is from the following scams, many of which were listed on the summary chart Gov. Ex. 404 (with the exceptions of Destiny Research Center, KX Promotions, and Next-Gen, all of which were discussed in detail at trial): Award Opportunity, BDK Mailing GmbH, Beckwith Astro, Club for Success, Destiny Research, Deuce Marketing, Diamond Dollars, Direct Line Promotions, Inc., Gold Rush, GS Direct – DTC, Haven Solutions, LLC, Horizon Marketing Services, Inc., J.L. Dietary Supplements Ltd. (JLDS), JKS Ventures LLC, Kronos Limited, KX Promotions, Inc., Mail Tree, Inc., National Consumer Division, Nature Plus Ltd., Next-Gen, Inc., NONA Trading, Inc., Olympic Research, Palm Beach Liquidation Gallery, Prime Source Publishing, Quantum Marketing, Inc., and Registered Disbursement Division.

larger.  Any reasonable calculation of foreseeable loss at this scale is more than $10 million.  For example, if only 2% of the consumers on the lists responded to the mailings and became victims of the scams, at an average loss of $20 per victim, the loss caused by the defendant selling 26.25 million consumer names to fraud schemes would be $10.5 million.   These are very conservative assumptions given that (1) these numbers are only from the last five years of the charged conspiracy; (2) the schemes often needed a higher than 2% response rates to initial mailings to break even, and frequently achieved a higher response rate with Epsilon's assistance; and (3) the schemes would then re-victimize any responders over and over again.  A more realistic estimate is likely several times higher, demonstrating that the proposed loss range of greater than $9.5 million is a reasonable, and quite conservative, estimate of the foreseeable loss caused by the defendant's scheme.

## III.    U.S. Sentencing Guideline Analysis

The 2023 U.S. Sentencing Guidelines Manual was utilized when calculating the advisory guidelines applicable to this case.  *See* U.S.S.G. § 1B1.11(a) ("The court shall use the Guideline Manuals in effect on the date that the defendant is sentenced.").

A. Grouping:  The jury convicted the defendant of conspiracy to commit mail and/or wire fraud, along with multiple counts of mail and wire fraud.  The mail and wire fraud counts refer to § 2B1.1 because they involved fraud and deceit, and are to be grouped pursuant to § 3D1.2(d).  The guideline for conspiracy is § 2X1.1, which does not automatically group under the guidelines.  However, counts involving substantially the same harm should be grouped together, including when the offense level is "determined largely on the basis of the total amount of harm or loss."  § 3D1.2(d).  Here, grouping would be

appropriate because the multiple substantive counts were examples of the conspiracy involving substantially the same harm, albeit to many victims. *See* Application Note 6 ("Examples: [] (2) The defendant is convicted of two counts of theft of social security checks and three counts of theft from the mail, each from a different victim. All five counts are to be grouped together."). For such grouped counts, the offense level is the highest offense level of the group. §3D1.3.

B. <u>Determining the Offense Guidelines</u>: The defendants were convicted of mail fraud and wire fraud offenses involving fraud and deceit, which are covered by § 2B1.1, and the Court should apply those guidelines. The defendant was also convicted of conspiracy to commit mail and wire fraud, which references Guideline § 2X1.1. Under § 2X1.1, the Court should apply the base offense level from the substantive offense (*i.e.*, mail fraud and wire fraud), plus any adjustments that can be established with reasonably certainty. Although guidelines for conspiracy convictions can be decreased, § 2X1.1(b)(2), they should not be here because this was a completed conspiracy. To the extent that the jury convicted on aiding and abetting, the offense level would be the same as for the underlying mail fraud and wire fraud offenses. § 2X2.1.

C. <u>Base Guidelines</u>: Each of the counts of conviction carries a maximum term of imprisonment of 20 years. Therefore, under § 2B1.1(a)(1), the base offense level is 7.

D. <u>Specific Offense Characteristics</u>: The following specific offense characteristics apply:

    1. There is a 20-level increase pursuant to § 2B1.1(b)(1)(F) because the loss was more than $9,500,000 and less than $25,000,000.

"The purpose of the loss calculation under the Sentencing Guidelines is 'to measure the

magnitude of the crime at the time it was committed." *United States v. Swanson*, 360 F.3d 1155, 1169 (10th Cir. 2004) (citations omitted).   The court need only make a reasonable estimate of the loss, U.S.S.G. 2B1.1 Application Note 3(c), for example, the approximate number of victims multiplied by the average loss to each victim, *id.* at 3(c)(iv).  Sentencing courts may make a reasonable estimate of loss based on the available information. U.S.S.G. § 2B1.1 cmt. n.3(c); e.g., *United States v. Levine*, 970 F.2d 681, 690 (10th Cir. 1992).  As discussed above, the calculation that actual loss is greater than $9.5 million is a reasonable estimate of actual loss based on the available information.

2. There is a 2-level increase pursuant to § 2B1.1(b)(2)(A) because the offense involved 10 or more victims and was committed through mass-marketing.

The defendant committed the crimes at a marketing company, and the role of mass-marketing in the scheme was a major focus of the evidence at trial.  As discussed above, there were, at the least, tens of thousands of victims.

3. There is a 2-level increase pursuant to § 2B1.1(b)(10)(c) because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means.

Sophisticated means "means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."  § 2B1.1 cmte n. 9(B).  Here, the defendant harnessed the technology of a market-leading data broker to carry out the fraud.  He did so using the data from 100 million American households, a team of Epsilon engineers to process data provided by scammers, and custom algorithms to predict targeted victims.  In addition, the use of list brokers like Jill Castellano to keep scam mailers at arm's length

14

increased the complexity of the scheme and assisted in concealing it. A number of the scam mailers serviced by the defendant's scheme were apparently located in jurisdictions such as Hong Kong and Switzerland, while still targeting victims in the United States. The execution of the scheme was thus quite sophisticated.

    4.   There is a 4-level increase pursuant to § 3A1.1(b) because the defendant knew or should have known that a victim of the offense was a vulnerable victim, and because the offense involved a large number of vulnerable victims.

The defendant should receive a 2-level enhancement pursuant to § 3A1.1(b)(1) because "[he] knew or should have known that a victim of the offense was a vulnerable victim." Moreover, he should receive an additional 2-level enhancement under § 3A1.1(b)(2) because "the offense involved a large number of vulnerable victims." *See e.g.*, Gov. Ex. 13. The application notes define "vulnerable victim" as "a person (A) who is a victim of the offense of conviction . . . and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." § 3A1.1 app. n. 2.

The evidence presented at trial demonstrated the vulnerability of the victims of the fraud and that the defendant knew or should have known that the people whose names he was selling were vulnerable. These victims were vulnerable because of their age and because of their susceptibility to scam mailings. Epsilon's entire data practice was premised on targeting the people most likely to respond to mailings. In this case, they used sophisticated modeling to identify the consumers most likely to send money to fraudulent astrology and sweepstakes mailings. That identification was based on a number of factors, including whether people were

"buyers" of other similar scam offers.  The very nature of this targeted marketing demonstrates the susceptibility of these customers to fraud.

The jury heard from two elderly victims and from the adult children of two other elderly victims.  William Shaw, aged 93, was in his eighties when Epsilon sold his name.  Carol Holcombe, aged 79, was in her seventies when Epsilon sold her name.  Ms. Holcombe testified about living on a fixed income over the past several years of less than $1,500 per month.  Eva Webb testified that her father Rene Hurtado passed away in 2019 at age 82 and was therefore in his late seventies when his name was sold.  Finally, Connor Farley testified that his father Noel Farley was 87 when he passed away in 2021 and was therefore in his eighties when Epsilon sold his name.  Connor Farley also testified that his father was firmly convinced that he had won a large sum money from these sweepstakes mailings, and that nothing Connor said would persuade Noel otherwise.  These victims were vulnerable based on their age and their susceptibility to scam mailings.

Reger knew the victims were elderly and susceptible to fraud.  Kessler testified that he himself was guilty because he "basically provided names to campaigns going to the elderly."  At one point, Kessler explained that a scam client called BDK mistakenly reached out to Epsilon's UK office instead of the US data practice.  Kessler knew this was an error because the UK office "didn't work with sweepstakes clients" because "there [were] concerns about just data usage and taking advantage of vulnerable people."  Kessler explicitly stated at trial that he knew the DTC was targeting vulnerable people, and the defendant's long history in the DTC Unit and marketing for sweepstakes is convincing evidence that he knew who was being targeted.  The defendant also reviewed and commented on Department of Justice press releases that repeatedly and

16

prominently stated that these kinds of schemes (some of which were their actual clients) were targeting the elderly and vulnerable.  E,g., Gov. Ex. 15.

Kessler further testified that the "opportunity seekers" category within the DTC Unit was grouped together partly because they were marketing to an older demographic and lower income demographic.  He defined "older" as "70 plus years" and "lower income" as "[p]eople that are maybe retired or just on a fixed income or just – just not well off, lower income."  Kessler said he studied the data, including reviewing demographic reports, and could see the ages of consumers and that many were retired.

Kessler also testified that Reger had access to the same demographic information as Kessler did and that they spoke about consumer demographics.  Testimony from Amanda Bates also demonstrated Reger's knowledge about DTC clients.  For example, Bates testified that she discussed shady or misleading DTC clients with others in the DTC unit, including when Reger was overseeing the unit.  Bates would meet with Reger weekly to talk through client lists.  Reger's knowledge about data modeling was also revealed in a December 2, 2015, email where he excitedly described a new "rich" source of data as one from which they could run "a suppression file of people who have filed for unemployment.  Or target them with sweeps offers."  Gov. Ex. 125.

The government also proved at trial that there were a large number of vulnerable victims.  Postal Inspector Elijah Hebert testified that Epsilon's consumer lists included thousands of names and that he and other inspectors had spoken with several people on these lists.  He said that the people they spoke with were generally over the age of 60.  Moreover, because of the very nature of Epsilon's business – targeting likely "buyers" – these large lists of consumers

17

were sold to fraud schemes specifically because Epsilon identified them as susceptible to fraud.

5.  There is a 4-level increase for Aggravating Role pursuant to § 3B1.1(a) because the defendant was an organizer and leader of a criminal activity with five or more participants or that was otherwise extensive.

The evidence at trial showed that Reger was an organizer and leader of the criminal activity. As the Vice President and later Senior Vice President supervising the DTC Unit, Reger had the authority to determine what clients the unit would serve. Reger supervised co-conspirators Kessler and Lytle, and gave them direction and guidance on how to conduct business in the unit. Reger was informed by those in the unit of the law enforcement actions in September 2016 and elected not to elevate that information or to stop doing business with clients and brokers involved in the law enforcement actions, and he withheld information in January 2017 when the legal department independently learned of the actions. In his capacity as an organizer and leader of the conspiracy, Reger thus ensured that the criminal activity continued.

Evidence at trial demonstrated that there were five or more participants and the criminal activity was extensive. As an initial matter, Reger, Lytle, and Kessler were all participants in the criminal activity, having all been convicted of conspiracy to commit mail and wire fraud based on their actions at Epsilon's DTC Unit. There were numerous additional criminal participants working at the fraudulent mail schemes and the list brokers. Shaun Sullivan, Phillip Lett, and Jill Baer Castellano each testified about their involvement in the purchase of data from the defendants for criminal activity, and each was convicted under a federal fraud statute for

criminal schemes that identified victims using data purchased from Epsilon.[3]

The government's witness list also included three other convicted felons from related matters: Daniel Arnold, Norman Newman, and John Muller. Daniel Arnold was a list broker who worked with Reger's DTC Unit for years and pleaded guilty to conspiracy to commit mail and wire fraud for his role in sourcing lists for the Destiny Research Center fraud scheme. *United States v. Arnold*, No. 2:18-cr-21 (E.D.N.Y.). After Arnold was terminated from his list brokerage, Reger and Kessler sought to assist him in finding a new job, and he applied to work at Epsilon. E.g., Gov. Exs. 227, 243. Norman Newman served as a list broker at Macromark, Inc. and pleaded guilty to conspiracy to commit mail fraud for his work with Swiss fraud mailer BDK GMBH. *United States v. Newman*, No. 3:20-cr-47 (D. Conn.); *see* Gov. Ex. 111. Macromark itself also pleaded guilty to conspiracy to commit mail fraud for participating in the BDK scheme, as did former list broker Steven Keats. *United States v. Macromark*, No. 3:20-cr-171 (D. Conn.); *United States v. Keats*, No. 2:18-cr-341 (E.D.N.Y.). John Kyle Muller (at times incorrectly spelled as "Mueller") appeared repeatedly in evidence regarding two fraudulent mailers that were clients of Epsilon, KX Promotions and JKS Ventures, the latter of which was a prize notice client recruited by Lytle in October 2016. Muller pleaded guilty in the District of Colorado in April 2024 to conspiracy to commit mail and wire fraud for his role in the JKS Ventures scam. *United States v. Muller*, No. 24:cr-36 (D. Colo.). In sum, five criminal

---

[3] Nor did these criminal participants act alone. A total of four individuals were convicted in the Sullivan/Castellano fraud scheme, *see United States v. Lovisa, et al*., No. 2:18-cr-349 (E.D.N.Y.), and three individuals were convicted in the Destiny Research scheme, *e.g.*, *United States v. Runner*, No. 2:18-cr-578 (E.D.N.Y.)

participants were convicted in or testified at the defendants' trial, and the evidence shows that there were many other participants in the criminal activity.

The evidence at trial showed that the criminal activity was extensive beyond just the number of criminal participants. "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants *but used the unknowing services of many outsiders could be considered extensive*." U.S.S.G. § 3B1.1 cmte n. 3 (emphasis added). The defendants' scheme relied on dozens of Epsilon employees to carry out its objective, including the account executives in the DTC Unit who executed data sales, and client services personnel who created the lists before shipping them to the defendants' clients.

**The adjusted offense level is therefore 39.**

E.    <u>Acceptance of Responsibility</u>: The defendant should not receive an adjustment for acceptance of responsibility after reaching trial three separate times and being convicted by a jury. The resulting offense level is therefore **39**.

F.    <u>Criminal History Category</u>: The defendant's criminal history computation is tentative. The criminal history category is determined by the Court based on the defendant's prior convictions. Based on information currently available to the Government, it is estimated that the defendant's criminal history category is **I**.

G.    <u>Imprisonment</u>: The advisory guideline range resulting from these calculations is **262-327** months (Zone D).

H.    <u>Fine</u>: Pursuant to guideline § 5E1.2(c)(3), the fine range for this offense is $50,000 to $500,000, plus applicable interest and penalties. For offenses where the maximum

fine may be twice the gross loss or gross gain, as in this case, the Guidelines specify that the maximum fine is that set by statute.  § 5E1.2(c)(4).  In addition, the Guidelines caution that where twice the loss is greater than the maximum of the fine guideline, an upward departure may be warranted.  *Id.* cmte n 4.  Moreover, where a guideline fine "would not be sufficient to ensure both the disgorgement of any gain from the offense that otherwise would not be disgorged (*e.g.*, by restitution or forfeiture) and an adequate punitive fine, an upward departure from the fine guideline range may be warranted."  *Id.*

  I. <u>Supervised Release</u>:  Pursuant to guideline § 5D1.2, if the Court imposes a term of supervised release, that term is not more than 3 years.

  J. <u>Restitution</u>:  The Government is not seeking restitution because the defendant's employer during the crimes, Epsilon Data Management, provided $127.5 million to make victims whole via a victim compensation fund.

## IV. <u>The 3553(a) Sentencing Factors Support a Sentence of Substantial Incarceration</u>

  All of the factors set forth in 18 U.S.C. § 3553(a) support a substantial prison sentence as recommended by the United States Sentencing Guidelines.

### A.  The Nature and Circumstances of the Offense Support a Guidelines Sentence

  The Court heard extensive evidence of the conspiracy at trial.  The harms inflicted by the defendant were extraordinarily widespread, and fully support the sentence recommended by the Guidelines and the government.  Reger combined his years of expertise in sweepstakes with the advanced marketing technology of a leading national data broker.  The multiyear fraud was not a crime of need or even opportunity.  Rather, Reger developed and sustained a corporate unit that casually and callously targeted millions of elderly and vulnerable victims for fraud.  At trial,

Reger suggested via his defense that he thought it was legal or even more implausibly, ethical, to participate in mass-mailings that promised regular people unattainable prizes for cash.  He did so in spite of having worked as a senior sweepstakes copywriter at a major sweepstakes company that went bankrupt in the face of dozens of lawsuits over similar claims – all filed in the two years that Reger worked there.  *Compare In re Am. Fam. Enters.*, 256 B.R. at 386 (detailing the dozens of suits and settlements with 40 state attorneys general), *and* Gov. Ex. 275B at 2 (Reger worked at AFP from May 1996 to January 1999).  Nor did Reger look back on this work history with regret.  In 2015, he reminisced about his time at AFP as "some of my most creative times ever!"  Reger wrote, "back then . . . killing it in sweeps was like a celebrity profession. What a trip? Seems like a lifetime ago, those names were like resurrecting true creative geniuses who knew no boundaries!"  **EXHIBIT C** (GOV01-01822741).  Reger's lack of ethical boundaries ultimately led to a leading role in defrauding hundreds of thousands of victims.

Here, the offense conduct involved other aggravating factors.  First, the scheme occurred over many years, and involved crimes committed with many parties.  Evidence at trial showed several dozen fraudulent mailers, including a number that became DTC customers while Reger was either recruiting clients or working as DTC Vice President.  Second, Reger supported the criminal scheme while pretending to be an ethics expert on sample mailings.  Multiple witnesses testified that Reger was forthcoming about his role as chair of the national ethics committee of the Direct Marketing Association, which also featured prominently on his corporate bio and resume.  Gov. Exs. 275A, 275B.  At the same time that Reger was passing judgment on other companies' sweepstakes creatives, his DTC Unit was selling data for similar scams.  Amanda Bates testified that Reger even told her that he thought an Epsilon client or clients were being

reviewed for deceptive mailings. Her reasonable reaction was, why aren't we doing something? The defendant claimed to have experience and skill in detecting problematic mailings, and his hypocrisy in selling consumer names to companies sending out fraudulent mailings at Epsilon speaks to the nature and circumstances of the offense. *See* U.S.S.G. § 3B1.3 (adjustment for abuse of trust or special skill).

### B. Need for Sentence to Reflect Seriousness of Offense, Promote Respect for Law, Provide Just Punishment, and Afford Adequate Deterrence

Although the significant victim loss contributes to the lengthy guideline sentence in this case, it does not fully capture the extraordinary nature of the offenses – where tens of millions were targeted for scams using sophisticated data modeling software. The victims who testified at trial were a minuscule yet evocative sample of the millions of Americans targeted and defrauded by the false promises of large prizes, personalized results, and answers to their problems. The payment slips from these fraudulent solicitations also showed how pernicious these crimes were; some included the option to split the requested small fee into two monthly payments, obviously targeting victims who did not even have a small amount in available funds. Nor were the losses caused by the schemes always small on a per victim basis. The data analysis undertaken for the Epsilon victim compensation effort has shown that many victims sent thousands of dollars over time to these schemes. Victims like Carol Holcombe, who testified at trial, are examples of the millions of Americans who struggle financially or wish for a better financial future. The defendant targeted those people, in practically every community across the United States.

Consequently, Reger deserves a significant sentence to demonstrate that the justice system takes his offenses seriously and that targeting the most vulnerable persons in society will

not be tolerated. In this case, deterrence may have particular value and effect. The Tenth Circuit has noted that white collar criminals "may be particularly susceptible to general deterrence because [they] often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment." *United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018) (quoting *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) (quotation and alteration omitted)). Here, the defendant's criminal conduct warrants a prison sentence to ensure that purveyors of data respect the law and the incredible power and responsibility inherent in selling bulk data. Nor is the defendant's conduct an outlier where there is no one to deter. Rather, the sale of consumer data to scams is a recurrent problem. For example, two data broker competitors of Epsilon (KBM Group, dba I-Behavior, and Wiland, Inc.) publicly acknowledged selling names to mail fraud scams and resolved cases with the Department of Justice. *United States v. KBM Group*, No. 1:21-CR-00198 (PAB) (D. Colo.); Oct. 4, 2022 Press Release, available at https://www.justice.gov/opa/pr/justice-department-expands-transnational-elder-fraud-strike-force-protect-older-americans (announcing non-prosecution agreement with Wiland to pay $4.4 million in victim compensation for sale of consumer data to operators of fraudulent schemes). Tellingly, Reger worked at one of those competitors, Wiland, until his indictment, and then was briefly rehired before his conviction at trial. A significant sentence of incarceration, as suggested by the guidelines, would clearly convey to the data broker industry that targeting the vulnerable for fraud is a great risk.

### C. Need to Provide Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment

The defendant appears to be in good health, he is well-educated, and has served as a top

executive at two significant companies.  The government is unaware of any needs of the defendant in these particular areas, or other reasons that would suggest incarceration is inappropriate.

### D.  Need to Avoid Unwarranted Sentencing Disparities

Only a sentence with significant incarceration would avoid an unwarranted sentencing disparity.  The avoidance of unwarranted sentencing disparities under § 3553(a)(6) "looks to uniformity on a national scale," rather than narrowly at codefendants.  *United States v. Ivory*, 532 F.3d 1095, 1107 (10th Cir. 2008).  A fraud scheme targeting millions, especially the elderly and vulnerable, using sophisticated means, and losses greater than $10 million will invariably suggest a guideline sentence of significant incarceration.  For example, three defendants running a $10 million mass-mailing fraud scheme targeting the elderly were recently sentenced to 168, 235, and 240 months in prison respectively.  *United States v. Castro, et al.*, No. 2:19-cr-295 (D. Nev.).  Glen Burke—a mailer who was discussed at trial—was sentenced to 87 months in prison after pleading guilty to a $20 million mass-mailing scheme.  *United States v. Burke*, No. 2:16-cr-262 (D. Nev.).  Patrice Runner, the leader of the Destiny Research Center scheme, was sentenced to 120 months in prison.  *United States v. Runner*, No. 2:18-cr-578 (E.D.N.Y).  Sean Novis and Gary Denkberg, mass mailers, were sentenced to 90 and 66 months in prison, respectively. *United States v. Novis, et al.*, No. 20-CR-335 (E.D.N.Y).   Anything less than a multi-year sentence of incarceration for Reger would be a disparate sentence.

Here the defendant's conduct merits a severe sentence given his leadership of the criminal scheme, role as a top executive, and complete failure to take responsibility.  In contrast, co-conspirator Kessler cooperated with the government shortly after contact from law

enforcement, accepted responsibility in pleading guilty, and testified about his role.  Kessler received a government recommendation of a sentence reduction based on substantial assistance and this Court sentenced him to probation, including lengthy community service serving the elderly.  In fact, many of the criminal participants involved in the defendants' scheme accepted responsibility.  *See, e.g.*, *United States v. Muller*, No. 24-cr-36 (D. Colo.) (sentencing scheduled for Nov. 1, 2024); *United States v. Arnold*, No. 2:18-cr-21 (E.D.N.Y.) (sentencing scheduled for July 30, 2024); *United States v. Castellano*, No. 2:18-cr-22 (E.D.N.Y.) (sentencing scheduled for July 30, 2024); *United States v. Newman*, No. 3:20-cr-47 (D. Conn.) (sentencing scheduled for August 22, 2024); *United States v. Lett*, No. 2:18-cr-261 (E.D.N.Y.) (awaiting sentencing).

In sum, a lengthy prison sentence will not result in an unwarranted disparity with other cases but instead fits the leadership role and enormous impact of the defendant's crimes.

### E.  Need to Provide Restitution to Any Victims of the Offense

There is no longer a need for the defendant to provide restitution to the thousands of victims because his employer took responsibility for the harm and financed a $127.5 million victim compensation effort.  The lack of restitution should be considered in determining the appropriate fine.  U.S.S.G. § 5E1.2.

WHEREFORE, the government requests that the Court sentence the defendant to a guideline sentence and substantial fine that ensures adequate deterrence and disgorgement of his ill-gotten gains.

Respectfully submitted this 28th day of June, 2024.

AMANDA N. LISKAMM
Director
United States Department of Justice
Consumer Protection Branch


By: */s/ Alistair Reader*
Alistair Reader
Senior Trial Attorney
Rachael Doud
Assistant Director
Consumer Protection Branch
U.S. Department of Justice
450 5th Street, NW, Suite 6400
Washington, DC 20530
(202) 353-9930 (Reader)
(202) 304-4599 (Doud)
Alistair.F.Reader@usdoj.gov
Rachael.Doud@usdoj.gov
Attorneys for the United States

MATTHEW T. KIRSCH
Acting United States Attorney


By: */s/ Rebecca S. Weber* .
Rebecca S. Weber
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
(303) 454-0332 (Weber)
Rebecca.Weber@usdoj.gov
Attorney for the United States